No. 20-50160

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

————————————

NEXTERA ENERGY CAPITAL HOLDINGS, INCORPORATED; NEXTERA ENERGY TRANSMISSION, L.L.C.; NEXTERA ENERGY TRANSMISSION MIDWEST, L.L.C.; LONE STAR TRANSMISSION, L.L.C; NEXTERA ENERGY TRANSMISSION SOUTHWEST, L.L.C.,

*Plaintiffs-Appellants*,

v.

COMMISSIONER ARTHUR C. D'ANDREA, Public Utility Commission of Texas, in his official capacity; COMMISSIONER SHELLY BOTKIN, Public Utility Commission of Texas, in her official capacity; CHAIRMAN DEANN T. WALKER, Public Utility Commission of Texas, in her official capacity,

*Defendants-Appellees*.

————————————

On Appeal from the United States District Court
for the Western District of Texas, Austin Division
No. 19-cv-00626

————————————

## BRIEF OF *AMICUS CURIAE* LSP TRANSMISSION HOLDINGS II, LLC IN SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL

————————————

SARAH E. WILLIAMS
KIRKLAND & ELLIS LLP
609 Main Street
Houston, TX 77022
(713) 836-3600

PAUL D. CLEMENT
 *Counsel of Record*
ERIN E. MURPHY
KASDIN M. MITCHELL
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
paul.clement@kirkland.com

*Counsel for Amicus Curiae LSP Transmission Holdings II, LLC*

April 8, 2020

## CERTIFICATE OF INTERESTED PERSONS

*NextEra Energy Capital Holdings, Incorporated et al. v. Commissioner Arthur C. D'Andrea, et al.*, No. 20-50160

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate potential disqualification or recusal.

Pursuant to Federal Rule of Appellate Procedure 26.1(a), LSP Transmission Holdings II, LLC, certifies that it is an indirect subsidiary of LS Power Associates, L.P., which is managed by LS Power Development, its general partner. No publicly held company holds a greater than 10% ownership interest in LSP Transmission Holdings II, LLC.

| *Plaintiffs-Appellants* | *Counsel for Plaintiffs-Appellants* |
|---|---|
| NextEra Energy Capital Holdings, Inc., NextEra Energy Transmission, LLC, NextEra Energy Transmission Midwest, LLC, Lone Star Transmission, LLC, NextEra Energy Transmission Southwest, LLC | Stuart H. Singer, Esq. Carlos M. Sires Evan Matthew Ezray Pascual Armando Oliu BOIES SCHILLER & FLEXNER, LLP Jeffrey Mark Tillotson TILLOTSON LAW |
| *Defendants-Appellees* | *Counsel for Defendants-Appellees* |
| Commissioner Arthur C. D'Andrea, Public Utility Commission of Texas, in his official capacity, Commissioner Shelly Botkin, Public Utility Commission of Texas, in her official capacity, Chairman Deann T. Walker, | Lisa Bennett John Richard Hulme, Esq. H. Carl Myers Jessica Elizabeth Soos OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF TEXAS |

| | |
|---|---|
| Public Utility Commission of Texas, in her official capacity | |
| *Other Interested Parties* | *Counsel for Other Interested Parties* |
| United States of America | Matthew C. Mandelberg<br>Makan Delrahim<br>Michael F. Murray<br>Daniel E. Haar<br>U.S. DEPARTMENT OF JUSTICE |
| Entergy Texas, Incorporated | Catherine Elise Garza<br>Lino Mendiola III<br>Michael A. Boldt<br>EVERSHEDS SUTHERLAND (US) LLP<br><br>Miguel Suazo<br>Wajiha Rizvi<br>George Hoyt<br>ENTERGY SERVICES, LLC |
| East Texas Electric Cooperative, Inc. | Lawrence Bradley Hancock, Esq.<br>Mark C. Davis<br>Theresa Wanat<br>Jacob Lawler<br>HOLLAND & KNIGHT LLP |
| LSP Transmission Holdings II, LLC | Paul D. Clement<br>Erin E. Murphy<br>Kasdin M. Mitchell<br>Sarah E. Williams<br>Kenneth A. Young<br>Anna Rotman<br>KIRKLAND & ELLIS LLP |
| Oncor Electric Delivery Company LLC | John C. Wander<br>Thomas S. Leatherbury<br>Winston Patrick Michael Skinner<br>Ethan Nutter<br>Megan Coker<br>VINSON & ELKINS, L.L.P.<br><br>Kevin W. Brooks<br>AXA EQUITABLE LIFE INSURANCE COMPANY |

| Southwestern Public Service Company | Jason Perkins<br>Matthew E. Price<br>Max Minzner<br>Tassity Johnson<br>JENNER & BLOCK LLP<br><br>Ron H. Moss<br>WINSTEAD P.C.<br><br>Mark A. Walker<br>XCEL ENERGY SERVICES INC. |
|---|---|
| Texas Industrial Energy Consumers | Katherine L. Coleman<br>Michael McMillin<br>THOMPSON & KNIGHT LLP |

s/Paul D. Clement
Paul D. Clement
 *Counsel of Record*
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
paul.clement@kirkland.com

*Counsel for Amicus Curiae LSP
Transmission Holdings II, LLC*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

TABLE OF AUTHORITIES ........................................................................ v

INTEREST OF *AMICUS CURIAE* ............................................................ ix

INTRODUCTION ....................................................................................... 1

REGULATORY BACKGROUND ................................................................. 2

SUMMARY OF ARGUMENT ..................................................................... 9

ARGUMENT ........................................................................................... 11

I.      Texas's Law Discriminates Against Interstate Commerce And Is Virtually *Per Se* Invalid ................................................................ 11

        A.      Texas's Law Discriminates Against Interstate Commerce on Its Face, in Its Effects, and in Its Purpose .......................... 12

        B.      The District Court's Contrary Conclusion Is Riddled With Errors ................................................................................. 16

II.     *Tracy* Does Not Immunize Texas's Law From Commerce Clause Scrutiny .................................................................................... 20

CONCLUSION ......................................................................................... 28

CERTIFICATE OF SERVICE ..................................................................... i

CERTIFICATE OF COMPLIANCE ............................................................ ii

# TABLE OF AUTHORITIES

## Cases

*Allstate Ins. Co. v. Abbott*,
    495 F.3d 151 (5th Cir. 2007) ..................................................................... 15, 19

*Buck v. Kuykendall*,
    267 U.S. 307 (1925) ......................................................................................16

*C&A Carbone, Inc. v. Town of Clarkston, New York*,
    511 U.S. 383 (1994) ..................................................................... 13, 14, 26

*Camps Newfound/Owatonna, Inc. v. Town of Harrison, Maine*,
    520 U.S. 564 (1997) ......................................................................................15

*Cooper v. McBeath*,
    11 F.3d 547 (5th Cir. 1994) ......................................................... 12, 14, 26

*Dean Milk Co. v. City of Madison*,
    340 U.S. 349 (1951) ........................................................................... 18, 26

*El Paso Elec. Co. v. FERC*,
    832 F.3d 495 (5th Cir. 2016) ........................................................................6

*Emera Maine v. FERC*,
    854 F.3d 662 (D.C. Cir. 2017). ....................................................................7

*Family Winemakers of Cal. v. Jenkins*,
    592 F.3d 1 (1st Cir. 2010) .............................................................................15

*FERC v. Elec. Power Supply Ass'n*,
    136 S. Ct. 760 (2016) .....................................................................................2

*Fla. Transp. Servs. v. Miami-Dade Cty.*,
    703 F.3d 1230 (11th Cir. 2012) ...................................................................18

*Ford Motor Co. v. Tex. Dep't of Transp.*,
    264 F.3d 493 (5th Cir. 2001) .......................................................................19

*Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Nat. Res.*,
    504 U.S. 353 (1992) ........................................................................... 12, 14

*General Motor Corp. v. Tracy*,
    519 U.S. 278 (1997)........................................................................ 2, 10, 21, 23

*Granholm v. Heald*,
    544 U.S. 460 (2005)................................................................................ 12, 18, 19

*Halliburton Oil Well Cementing Co. v. Reily*,
    373 U.S. 64 (1963).................................................................................................19

*Lewis v. BT Inv. Managers, Inc.*,
    447 U.S. 27 (1980)........................................................................................ 12, 19

*LSP Transmission Holdings, LLC v. Sieben*,
    No. 18-2559, 2020 WL 1443533 (8th Cir. Mar. 25, 2020)......................... 25, 26

*MISO Transmission Owners v. FERC*,
    819 F.3d 329 (7th Cir. 2016)................................................................................6

*New England Power Co. v. New Hampshire*,
    455 U.S. 331 (1982)............................................................................... 3, 21, 22

*New York v. FERC*,
    535 U.S. 1 (2002).................................................................................................17

*Okla. Gas & Electric Co. v. FERC*,
    827 F.3d 75 (D.C. Cir. 2016) ..............................................................................7

*Old Dominion Elec. Coop. v. FERC*,
    898 F.3d 1254 (D.C. Cir. 2018) .........................................................................17

*Pennsylvania v. West Virginia*,
    262 U.S. 553 (1923)..........................................................................................3, 21

*S.C. Pub. Serv. Auth. v. FERC*,
    762 F.3d 41 (D.C. Cir. 2014) .................................................................... 4, 5, 6

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
    139 S. Ct. 2449 (2019)................................................................................ *passim*

*Veasey v. Abbott*,
    830 F.3d 216 (5th Cir. 2016)...............................................................................16

*W. Lynn Creamery, Inc. v. Healy*,
 512 U.S. 186 (1994) ........................................................................... 18

*Wyoming v. Oklahoma*,
 502 U.S. 437 (1992) ................................................................ 3, 21, 22

**Statutes**

16 U.S.C. §824 ........................................................................................... 3

16 U.S.C. §824a .................................................................................... 3, 22

17 Okl. St. §292 (2013) ............................................................................. 7

Minn. Stat. §216B.246 (2012) ................................................................. 7

N.D. Cent.Code §49-03-02.2 (2013) ....................................................... 7

R.R.S. Neb. §70-1028(1) (2013) ............................................................... 7

S.D. Codified Laws §49-32-20 (2011) .................................................... 7

Tex. Utils. Code §37.056 .................................................................... 8, 12

**Other Authorities**

House State Affairs Committee (April 1, 2019),
 *video available at* https://bit.ly/2UUwiQw .................................... 8, 15

*Midcontinent Independent System Operator, Inc.*,
 162 FERC ¶61,063 (2018) .................................................................... 5

*Promoting Wholesale Competition Through Open Access Non-
 discriminatory Transmission Services by Public Utilities; Recovery
 of Stranded Costs by Public Utilities and Transmitting Utilities*,
 75 FERC ¶61,080 (Apr. 24, 1996) ....................................................... 4

Public Utility Commission of Texas, Scope of Competition in Electric
 Markets in Texas, Report to the 86th Legislature (Jan. 2019),
 *available at* https://bit.ly/2UDK0Y9 .................................................. 8

*Regional Transmission Organizations*,
 89 FERC ¶61,285 (Dec. 20, 1999) ....................................................... 4

Selection Report, *Hartburg-Sabine Junction 500 kV Competitive Transmission Project* (Nov. 27, 2018), *available at* https://bit.ly/2w8TEII ...................................................................25

*Southwest Power Pool* (6th rev.) (Apr. 1, 2020), *available at* https://bit.ly/2RpwDc6.......................................................................6

*Transmission Planning & Cost Allocation by Transmission Owning & Operating Pub. Utils.*, Order No. 1000, 136 FERC ¶61,051 (July 21, 2011) ...................................................... 5, 6, 24, 25

## INTEREST OF *AMICUS CURIAE*

LSP Transmission Holdings II, LLC ("LSP") is a transmission company whose subsidiaries and affiliates have competed for transmission projects in Texas and would like to continue to do so. But a recent Texas law precludes them from doing so if they do not already own transmission facilities in Texas. Appellants (collectively, "NextEra") brought this action challenging that law under the Commerce Clause and Contracts Clause. LSP has a strong interest in invalidating the law and moved to intervene in the district court proceedings. The court denied LSP's motion, and LSP has timely appealed that denial. While that appeal is pending, LSP submits this *amicus* brief to aid the Court's resolution of the Commerce Clause question.

Pursuant to Federal Rule of Appellate Procedure 29(a)(4), LSP certifies that no party authored this brief in whole or in part, and no party, party's counsel, or other person other than LSP contributed money that was intended to fund preparing or submitting the brief.

**INTRODUCTION**

In 2018, after holding a competitive selection process that considered everything from cost to reliability, the federally regulated regional transmission organization that manages the interstate transmission grid for much of the Midwest selected NextEra Energy Transmission Midwest as the best entity to construct, own, and operate a new transmission line on that interstate grid. While that $114 million project is located in Texas, it will serve and be paid for (at federally approved rates) by customers all across a transmission grid that spans from Texas to Minnesota. Last year, however, Texas enacted a law designed to prevent NextEra from building this project, by mandating that henceforth all new transmission lines in Texas—including those that are part of an interstate grid—must be built and owned by entities that already own transmission facilities in Texas. By its express terms, that law discriminates in favor of entities with an existing in-state presence and against interstate commerce. That is a classic protectionist law that is virtually per se invalid under the Commerce Clause.

The district court concluded otherwise only by misreading Texas's law and Commerce Clause precedent. The court's holding that the law does not involve interstate commerce at all because it regulates transmission lines that begin and end in Texas overlooks that those lines are part of the *interstate* transmission grid. That a particular segment of that grid runs within a single state's border does not change

its interstate character. Moreover, the court's holding that *General Motor Corp. v. Tracy*, 519 U.S. 278 (1997), immunizes Texas's law from Commerce Clause scrutiny extends *Tracy* beyond its appropriate scope and flouts decades of more apposite Supreme Court precedent. *Tracy* concerned a state law that regulated public utilities' sale of electricity to captive retail customers—an area Congress expressly reserved to the states, to preserve their traditional authority to grant local service area monopolies. Far from regulating retail sales exclusively reserved to the states, Texas's law governs *federally* regulated *interstate* transmission lines—an area Congress reserved to FERC. *Tracy* does not apply here at all, let alone relieve the state of its heavy burden to justify its presumptively *per se* invalid law.

## REGULATORY BACKGROUND

1. In the early 20th century, electricity markets largely "operat[ed] as vertically integrated monopolies in confined geographic areas." *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 768 (2016). Over time, however, an interstate market for electricity developed, with resource-rich states generating electricity to sell at wholesale for transmission across state lines to local retail distributors. In 1935, Congress enacted the Federal Power Act ("FPA") to regulate this burgeoning interstate market.

The FPA gave FERC (formerly the Federal Power Commission) exclusive jurisdiction over the interstate transmission and wholesale sale of electricity. 16

U.S.C. §824(b)(1). But the FPA largely left to the states matters they had traditionally regulated, such as the siting and permitting of facilities used to generate electricity, used in local distribution, or used only for *intra*state transmission. *Id.* Congress later amended the FPA to direct FERC to "divide the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy," and to assign FERC the "duty" to "promote and encourage such interconnection and coordination." *Id.* §824a(a).

While states retain some regulatory power over transmission and generation facilities used in interstate commerce, the Supreme Court has repeatedly made clear that these powers remain constrained by the dormant Commerce Clause. Indeed, the Court has not hesitated to strike down state energy regulations that discriminated against interstate commerce, even when states argued that they were necessary to their retail markets. *See, e.g.*, *Wyoming v. Oklahoma*, 502 U.S. 437 (1992) (invalidating Oklahoma law requiring coal-fired electric utilities to burn a coal mixture containing at least 10% Oklahoma-mined coal); *New England Power Co. v. New Hampshire*, 455 U.S. 331 (1982) (invalidating New Hampshire law requiring hydroelectric generators to obtain state approval to transmit energy out of state); *cf. Pennsylvania v. West Virginia*, 262 U.S. 553 (1923) (invalidating West Virginia law requiring pipeline companies to serve in-state consumers first).

2. Over time, more generators emerged to compete with vertically integrated utilities, and interconnected interstate electric systems became increasingly prevalent and economical. *See S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 49-50 (D.C. Cir. 2014). But local utilities attempted to use their control over transmission lines to bar competition by refusing to deliver wholesale energy produced by these emerging generators, or by making their lines available to competitors "only on inferior terms." *Id.* at 50. FERC responded with a series of orders to combat these monopolistic tendencies and promote the development of competitive interstate markets.

In 1996, FERC ordered any facility that connects to the interstate grid to unbundle its wholesale generation and transmission services and allow access to transmission on a non-discriminatory basis. *See Promoting Wholesale Competition Through Open Access Non-discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, 75 FERC ¶61,080 (Apr. 24, 1996). FERC followed up with an order encouraging owners of transmission facilities serving interstate commerce to cede operation of their systems to independent system operators or regional transmission organizations (collectively, "ISOs"). *See Regional Transmission Organizations*, 89 FERC ¶61,285 (Dec. 20, 1999). ISOs are nongovernmental agencies vested with authority, through

FERC-approved tariffs, to operate and plan the expansion of interstate transmission grids on a regional and interregional basis.

In 2010, FERC recommended additional reforms to "ensure that [interstate transmission] services are provided at rates, terms and conditions that are just and reasonable and not unduly discriminatory or preferential." *S.C. Pub. Serv. Auth.*, 762 F.3d at 52. The next year, FERC issued Order No. 1000. *See Transmission Planning & Cost Allocation by Transmission Owning & Operating Pub. Utils.*, Order No. 1000, 136 FERC ¶61,051 at ¶256 (July 21, 2011). Until then, FERC had let ISOs have rules allowing the owner of a facility to which a new interstate transmission line would connect a right of first refusal to build that line. Among other key reforms, Order No. 1000 required ISOs to eliminate some of those rights.

Generally speaking, FERC divides new transmission projects into two categories: regional projects and local projects. Regional projects address the needs of more than one transmission owner in the multi-state region, so some or all of their costs are allocated to customers across multiple states, even if a new line is located exclusively in one state. Under the Midcontinent Independent System Operator ("MISO") tariff, for example, 20% of the costs of certain regional projects are spread across the entire 15-state region, and the remaining costs may be shared across multiple states as well. *Midcontinent Independent System Operator, Inc.*, 162 FERC ¶61,063 (2018); *see also* Open Access Transmission Tariff, *Southwest Power Pool*

5

(6th rev.) (Apr. 1, 2020) at Attachment J, *available at* https://bit.ly/2RpwDc6.  The Hartburg-Sabine Project in Texas is a regional, cost-allocated project.  Local projects, by contrast, address only the local needs of the transmission owner, and their costs are allocated only to that transmission owner's customers.

While FERC decided to continue to permit rights of first refusal for local projects, it decided to eliminate them for regional, cost-allocated projects.  FERC detailed the costs of these incumbent preferences, explaining that right-of-first-refusal provisions discourage non-incumbent transmission developers from investing in transmission.  Order No. 1000 ¶256.  FERC therefore concluded that such provisions undermine the development of more efficient and/or cost-effective solutions to regional transmission needs and deprive customers of the benefits of competition.

Incumbent transmission owners predictably objected to Order No. 1000, but the D.C. Circuit affirmed FERC's power to issue it, finding that "basic economic principles make clear that rights of first refusal are likely to have a direct effect on the costs of transmission facilities because they erect a barrier to entry."  *S.C. Pub. Serv. Auth.*, 762 F.3d at 75.  This Court and other courts of appeals also rejected transmission owners' arguments that such exclusive rights were contractually protected.  *See El Paso Elec. Co. v. FERC*, 832 F.3d 495, 507 (5th Cir. 2016); *MISO Transmission Owners v. FERC*, 819 F.3d 329, 333 (7th Cir. 2016); *Okla. Gas &*

*Electric Co. v. FERC*, 827 F.3d 75, 80 (D.C. Cir. 2016); *Emera Maine v. FERC*, 854 F.3d 662, 671-72 (D.C. Cir. 2017).

3. Some states responded to Order No. 1000 by erecting their own barriers to competitive transmission on interstate grids. *See* Minn. Stat. §216B.246, Subd. 1(c) (2012); N.D. Cent.Code §49-03-02.2 (2013); S.D. Codified Laws §49-32-20 (2011); R.R.S. Neb. §70-1028(1) (2013); 17 Okl. St. §292 (2013). While Texas initially declined to follow this constitutionally dubious path, last year it outdid those jurisdictions and amended its utilities code to give incumbents even greater insulation from competition than FERC tolerated before Order No. 1000.

Like most states, Texas has abandoned vertical integration and permits local retail distributers to obtain electricity through wholesale purchase and transmission. Much of Texas is operated by the Electric Reliability Council of Texas ("ERCOT"), which regulates a transmission grid wholly within and wholly regulated by Texas. But some parts of Texas are served by FERC-regulated interstate grids: (1) parts of eastern Texas are served by MISO, which spans 15 states and parts of Canada; (2) parts of eastern Texas and the Texas Panhandle are served by the Southwest Power Pool ("SPP"), which serves 14 states; and (3) parts of West Texas are served by the Western Electricity Coordinating Council ("WECC"), which serves 14 states and parts of Canada and Mexico. *See* Public Utility Commission of Texas, Scope of

Competition in Electric Markets in Texas, Report to the 86th Legislature, at 9 (Jan. 2019), *available at* https://bit.ly/2UDK0Y9.

Consistent with Order No. 1000, ISOs eliminated rights of first refusal for regional projects. But last year, Texas amended its own laws to go beyond rights of first refusal and wholly preclude anyone who does not already operate transmission lines in Texas from constructing any new transmission lines—including regional, cost-allocated lines on the interstate grid—in Texas. *See* Tex. Utils. Code §37.056(e)-(f). That law was a direct response to MISO's selection of NextEra—not the local incumbent—to build the regional, cost-allocated Hartburg-Sabine line. It also was an avowed effort to undermine FERC's efforts to increase competition on interstate grids. At a committee hearing on the bill, Representative Phelan, the bill's sponsor, noted that it was a response to "doors opened by FERC." House State Affairs Committee at 8:41:02-8:41:43 (April 1, 2019), *video available at* https://bit.ly/2UUwiQw (Rep. Phelan). He further explained that the bill would grant exclusive rights to in-state interests even if MISO found that an out-of-state competitor was the better choice, claiming that "transmission operations are best managed by accountable companies with boots on the ground in our communities." ROA.47.

## SUMMARY OF ARGUMENT

Texas's law discriminates against interstate commerce on its face, in its effects, and in its purpose. It discriminates on its face by granting transmission owners who already own in-state transmission facilities the *exclusive* right to build and operate new transmission lines that form part of the *interstate* transmission grid that serves (and is paid for by) consumers across several states. It discriminates in its effects by granting entities with an in-state presence the exclusive right to build and operate these interstate transmission lines at the direct expense of out-of-state entities that lack such a presence. And it discriminates in its purpose, as Texas enacted it to favor local interests that already had "boots on the ground" in Texas. Under settled Supreme Court precedent, the law triggers demanding scrutiny that it plainly cannot survive.

The district court's contrary conclusion rested on a misguided understanding of the Commerce Clause. First, to the extent the court held that Texas's discriminatory law regulates transmission lines only within Texas's borders, and hence is not subject to the Commerce Clause, that is patently incorrect. The Commerce Clause prevents efforts to reserve a local market to in-state interests. And this law regulates lines that are part of nationally regulated interstate grids and paid for by customers across multiple states at FERC-regulated rates. Reserving such a

channel or instrumentality of interstate commerce for in-state entities is completely antithetical to the Commerce Clause.

Texas's law thus is plainly unconstitutional unless it is somehow immune from Commerce Clause scrutiny. It is not. *General Motors Corp. v. Tracy*, 529 U.S. 278 (1997), does not immunize all laws involving energy regulation, or the law at issue, from Commerce Clause scrutiny. The Supreme Court has repeatedly made clear—including in *Tracy* itself—that the Commerce Clause applies to state energy regulations. And it has not hesitated to invalidate such regulations when they discriminate against interstate commerce, even if a state claims that discrimination is necessary to effectuate its retail powers. *Tracy* did not overrule that long line of precedent. It merely recognized that the Commerce Clause does not constrain state laws in the specific and narrow area Congress exclusively reserved to the states: in-state sales by public utilities to captive retail customers. While *Tracy* concluded that the FPA expressly preserved the states' power to protect those local monopolies from competition, it nowhere embraced the sweeping proposition that the Commerce Clause does not apply to any aspect of the gas and electricity markets. And *Tracy* certainly does not hold that states may discriminate against interstate commerce in the *interstate* markets that the FPA tasks *FERC* with regulating.

The district court's reliance on *Tracy* was therefore misplaced. And the Eighth Circuit's recent emphasis, in approving a similar Minnesota law, on the fact that

regulation of transmission siting and construction is within the state's police power is even further afield. The mere fact that a state law implicates the state's police power does nothing to immunize it from Commerce Clause scrutiny. Moreover, the law here goes well beyond siting and dictates who may build and operate *interstate* transmission lines that will be paid for in substantial part by out-of-state customers. Nothing in *Tracy* or any other Supreme Court decision immunizes discrimination concerning such instrumentalities of interstate commerce from Commerce Clause scrutiny or saves Texas's obviously discriminatory law.

## ARGUMENT

### I. Texas's Law Discriminates Against Interstate Commerce And Is Virtually *Per Se* Invalid.

The Commerce Clause empowers Congress "to regulate commerce among the several states." U.S. Const. art. I, §8, cl.3. The Supreme Court has "long held" and recently reaffirmed "that this Clause … prevents the States from adopting protectionist measures and thus preserves a national market for goods and services." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019). "If a state law discriminates against … nonresident economic actors," then it "can be sustained only on a showing that it is narrowly tailored to advance a legitimate local purpose." *Id.* at 2461. Such discriminatory laws are virtually *per se* invalid because they almost always reflect a protectionist effort to benefit local interests at the expense of out-of-state interests. *See, e.g.*, *Fort Gratiot Sanitary Landfill, Inc. v.*

*Mich. Dep't of Nat. Res.*, 504 U.S. 353, 361 (1992). It is little surprise, then, that "state statutes that directly discriminate against interstate commerce, or whose effects favor in-state economic interests at the expense of out-of-staters, are routinely struck down." *Cooper v. McBeath*, 11 F.3d 547, 553 (5th Cir. 1994). Texas's discriminatory law should meet the same fate.

## A. Texas's Law Discriminates Against Interstate Commerce on Its Face, in Its Effects, and in Its Purpose.

By granting an exclusive right to entities with a physical presence in Texas to construct and operate transmission lines that serve and are paid for by consumers across several states, Texas's law discriminates against interstate commerce on its face. By its terms, Texas law reserves the right to "build, own, or operate" a new transmission line—including an interstate line that serves and is paid for by consumers in other states—to companies that already own and operate an in-state facility. Tex. Utils. Code §37.056(e)-(f). That is blatant facial discrimination against out-of-state interests. *See Granholm v. Heald*, 544 U.S. 460, 474 (2005) (finding unconstitutional state law that "grants in-state wineries access to the State's consumers on preferential terms"); *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 42 n.9 (1980) ("discrimination based on the extent of local operations is itself enough to establish … local protectionism").

Indeed, Texas's law is not materially different from the Tennessee law that the Supreme Court just held "plainly favors Tennesseans over nonresidents" in violation

of the Commerce Clause. *Tenn. Wine*, 139 S. Ct. at 2462. Just as Tennessee required companies that wanted to own or operate a liquor store to first establish an in-state presence, Texas's law requires companies that want to own or operate a transmission line in Texas to have an in-state presence. If Tennessee had limited new liquor licenses to holders of existing Tennessee liquor licenses, the discrimination would have been even more blatant. Nothing about the Commerce-Clause-violating discrimination (as opposed to the possible Twenty-First-Amendment-based justification) was limited to alcohol. The Supreme Court found it obvious that Tennessee's law "could not be sustained if it applied across the board to all those seeking to operate any retail business in the State." *Id.* at 2474. Here too, Texas's law is blatantly discriminatory and thus likewise virtually *per se* invalid. And the impact on interstate commerce is even more pronounced, as Texas has sought to reserve not a market to sell a product at retail, but a market to build instrumentalities of interstate commerce that are paid for by consumers in other states.

Texas's law also runs headlong into the Supreme Court's numerous cases invalidating under the Commerce Clause state or municipal "flow control" laws. In *C&A Carbone, Inc. v. Town of Clarkston, New York*, 511 U.S. 383 (1994), for example, a local law required all solid waste collected in the town to be delivered to a designated in-town transfer station or processing facility, which the town justified on the ground that the economic viability of the facility depended on an adequate

supply of waste. *Id.* at 386. The Court invalidated the law, holding that laws that grant an absolute preference to a particular local interest at the expense of all others violate the Commerce Clause because they "depriv[e] competitors, including out-of-state firms, of access to a local market." *Id.* at 386; *see also Fort Gratiot*, 504 U.S. at 361. Again, Texas's law is even more problematic, as it attempts to reserve the actual instrumentalities of interstate commerce to in-state interests. Just as states and localities cannot enact facially protectionist laws to protect the waste disposal or alcohol industries, they *a fortiori* cannot protect in-state interests when it comes to actual instrumentalities of interstate commerce.

While that facial discrimination suffices to render the law virtually *per se* invalid, Texas's law also discriminates in its effects and purpose. *See Cooper*, 11 F.3d at 553 ("[A] finding of economic protectionism can be based solely upon a statute's discriminatory effect."). The entities to which the law grants exclusive rights all already, by definition, have an in-state presence. That in-state presence, much like a requirement that a company do a qualifying amount of in-state business or own in-state property, makes the beneficiaries in-state in the relevant sense. They have "boots on the ground," local employees, and distinct access to local governments and state legislators. Thus, all the benefits of the statute fall to in-state interests in the relevant sense, while out-of-state entities bear most of the burdens. *See Camps Newfound/Owatonna, Inc. v. Town of Harrison, Maine*, 520 U.S. 564,

581 (1997); *Family Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 10-11 (1st Cir. 2010) (finding law that principally benefits in-state market discriminatory even though it benefited some out-of-state companies).

The law also was passed with the purpose of discriminating against out-of-state entities in favor of in-state ones. *See Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 160 (5th Cir. 2007). Indeed, its entire design is to prohibit those without an in-state presence from owning transmission lines in the state. Its sponsor acknowledged that the law sought to respond to "doors opened by FERC with their order"—*i.e.*, Order No. 1000, which introduced competition for interstate transmission lines. *See* House State Affairs Committee at 8:41:02-8:41:43 (April 1, 2019) (Rep. Phelan). He was explicit in his preference for in-state interests because in his view (but notably not FERC's), "transmission operations are best managed by accountable companies with boots on the ground in our communities." ROA.47.

It also is telling that the law was passed immediately after MISO awarded NextEra Energy Transmission Midwest—a company with no in-state transmission—a competitive regional, cost-allocated project. *See* NextEra Br.48. MISO, the FERC-regulated ISO, decided that NextEra was the superior option to construct and operate that new project, which will be paid for in part by customers outside of Texas. And the legislature responded by passing a law expressly designed to transfer that project from NextEra to a company with "boots on the ground" in Texas. That

is a classic example of the kind of localism that the Commerce Clause renders suspect. At the very least, those facts plainly suffice to state a claim for discriminatory purpose at the motion-to-dismiss stage. *See Veasey v. Abbott*, 830 F.3d 216, 235 (5th Cir. 2016) (discriminatory purpose is a fact question).

### B. The District Court's Contrary Conclusion Is Riddled With Errors.

To the extent the district court held that Texas's law does not discriminate against interstate commerce, its analysis is plainly incorrect. The court first suggested that Texas's law does not require Commerce Clause scrutiny because it "regulates only the construction and operation of transmission lines and facilities within Texas." ROA.3031. But Texas's law regulates new transmission lines that are part of *interstate* transmission grids, which are classic instrumentalities of interstate commerce: They are the lines through which electricity is transmitted across states. That a particular stretch of line may be located wholly in one state makes no difference. The stretch of I-20 that runs between Dallas and Midland is no less part of the interstate highway system than the stretch that runs from Dallas to Shreveport. *See Buck v. Kuykendall*, 267 U.S. 307, 315-16 (1925) (state effort to "prohibit[] competition" on stretch of interstate highway within its borders "is a regulation, not of the use of its own highways, but of interstate commerce").

If anything, in-state segments of an interstate transmission grid are even more obviously instrumentalities of interstate commerce, for "any electricity that enters

the grid immediately becomes a part of a vast pool of energy that is constantly moving in interstate commerce." *New York v. FERC*, 535 U.S. 1, 7 (2002). It is not even physically possible for part of such an interconnected line to serve Texas alone, which is precisely why FERC does not restrict the costs of a new line located in Texas to Texas consumers, but rather allocates the costs across the entire region. *See Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254, 1257 (D.C. Cir. 2018).

That makes Texas's effort to reserve these lucrative interstate business opportunities to local interests particularly pernicious. As *Carbone* and *Tennessee Wine* make crystal clear, even laws that attempt to reserve local markets to locals are not insulated from Commerce Clause scrutiny. A law that reserves an *interstate* market fares even worse. It is akin to Texas forcing Louisianans to pay for a portion of I-20 that only Texas companies can build. And it adds insult to injury when the Texas companies competing for the project are demonstrably inferior to out-of-state companies who would have been able to compete but for Texas's law. This is a case in point, as MISO—the *federally* regulated operator of the interstate grid of which the project is a part—selected NextEra, not the local incumbent, as the best option to build the Hartburg-Sabine line. It is hard to see how anything other than protectionism could justify Texas displacing the federally regulated ISO's judgment about whose proposal to construct an interstate transmission line will best ensure that interstate transmission rates are just and reasonable.

It is no answer that some of the companies with an in-state presence "are owned by out-of-state companies." ROA.3032. There is no denying that the law discriminates based on whether a company has a physical, in-state presence, which is what matters for Commerce Clause purposes. The district court could not identify a single precedent supporting the proposition that *facial* discrimination against out-of-state competitors may be excused so long as some of the facially preferred in-state interests are incorporated or have shareholders in another state. Nor could it, for Supreme Court precedent forecloses that argument. In *Granholm*, for example, the Court invalidated a New York law that allowed wineries with an in-state presence to ship wine directly to consumers but prohibited out-of-state wineries from doing the same. The Court did not ask whether the New York wineries were owned by New York citizens, by out-of-state corporations, or even by foreign nationals. *Granholm*, 544 U.S. at 475; *see also, e.g.*, *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 194 (1994) (no consideration given to whether in-state milk producers were owned by in-state citizens); *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 352 (1951) (same with respect to dairy pasteurization facilities); *Fla. Transp. Servs. v. Miami-Dade Cty.*, 703 F.3d 1230, 1259 (11th Cir. 2012) (focusing on "where the company's business takes place or where its political influence lies"). In short, "discrimination based on the extent of local operations is itself enough to establish

the kind of local protectionism" that is virtually *per se* invalid.  *Lewis*, 447 U.S. at 42 n.9.

Nor is it any answer to claim that Texas "allows out-of-state providers" to enter the market by "buying a Texas utility."  ROA.3032.  Even assuming that is a real rather than theoretical option, states "cannot require an out-of-state [company] 'to become a resident in order to compete on equal terms.'"  *Granholm*, 544 U.S. at 475; *see also Tenn. Wine*, 139 S. Ct. at 2462; *Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64, 72 (1963).  It could hardly be otherwise.  If the only way to compete is to "become a local" by buying an in-state company, that just highlights the impermissible discrimination in favor of local in-state interests.  Simply put, a Commerce Clause problem cannot be cured by declining to prohibit an out-of-state company from purchasing an in-state company to conduct business.

Finally, to the extent the district court declared "out-of-state providers such as NextEra" "not similarly situated" with in-state entities simply because they do not have an in-state presence, ROA.3032, that *ipse dixit* turns Commerce Clause principles on their head.  As this Court has explained, "a State statute or regulation is discriminatory when it provides for differential treatment of similarly situated entities *based upon their contacts with the State*."  *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 501 (5th Cir. 2001) (emphasis added); *see also Allstate*, 495 F.3d at 163 ("A state statute impermissibly discriminates" whenever it "discriminates

between similarly situated *in-state and out-of-state interests*." (emphasis added)). In that respect, the Commerce Clause is akin to other antidiscrimination doctrines. No one would say that male and female accountants are not similarly situated for purposes of sex-discrimination claims because the male accountants are men. The whole point is that sex-based differences should not matter for *otherwise* similarly situated individuals. Likewise, the whole point of dormant Commerce Clause doctrine is that differences based on the degree of connection with the state should not matter for *otherwise* similarly situated businesses. The fact that one has an in-state presence and the other does not is what gives rise to a Commerce Clause problem, not what cures one.

## II. *Tracy* Does Not Immunize Texas's Law From Commerce Clause Scrutiny.

To the extent the district court embraced the sweeping proposition that the Supreme Court's decision in *Tracy* forecloses a Commerce Clause challenge to any law that a state claims is necessary "to avoid any jeopardy or disruption to the service of electricity to the state electricity consumers and to allow for the provision of a reliable supply of electricity," ROA.3031-3032, that too is patently incorrect. *Tracy* did not immunize from Commerce Clause scrutiny all state laws that seek to establish or protect a "monopoly market." ROA.3031. If it did, it would have implicitly overruled nearly a century of Commerce Clause precedent invalidating state laws that sought to create or protect local monopolies. Nor did *Tracy* immunize

from Commerce Clause scrutiny all state laws that bear some relationship, no matter how attenuated, to "the provision of a reliable supply of electricity." ROA.3031-3032. Again, if it did, the Court would have had to overrule nearly a century of Commerce Clause cases invalidating state efforts to justify discrimination in the energy or gas markets as necessary to the effective regulation of their retail markets. *See, e.g.*, *Wyoming*, 502 U.S. at 469; *New England Power*, 455 U.S. at 339; *Pennsylvania*, 262 U.S. at 596-600.

Unsurprisingly, *Tracy* did not purport to do anything so radical. It instead just addressed one very narrow sphere—namely, direct regulation of retail gas (and, by implication, electricity) sales to a captive market. Because the nation's retail gas markets, like its retail electricity markets, had historically been served by local monopolies, the Court concluded that by reserving exclusive authority over retail sales to the states, Congress preserved "the States' interest in protecting the captive market from the effects of competition." *Tracy*, 519 U.S. at 306. Ohio's sales tax exemption for gas purchased from a local monopoly distributor thus did not run afoul of the Commerce Clause, for it was a direct effort to protect from competition the captive retail market over which local distributors had been granted monopolies.

Texas's law manifestly does not regulate the sale of electricity to local customers by local monopoly distributors. Indeed, it regulates almost the opposite end of the local-to-interstate spectrum: who may construct and operate transmission

lines that are part of an *interstate* grid.  The market for interstate transmission is a market that the FPA expressly reserved to FERC, not the states.  *See* 16 U.S.C. §824a.  While the states may still have siting and other powers over transmission facilities, just as they still have siting and other power over generation facilities, state regulations of transmission facilities that connect to the interstate grid are no more immune from Commerce Clause scrutiny than state regulations of generation facilities that sell electricity at wholesale.  *See Wyoming*, 502 U.S. at 469; *New England Power*, 455 U.S. at 339.

It makes no more difference here than it did in those cases that the state seeks to justify its discrimination as critical to the "provision of a reliable supply of energy."  ROA.3031-3032.  Even assuming Texas could substantiate that claim (which in any event goes to whether its discrimination is *justified*, not whether it *exists*), Texas decided to abandon vertical integration and connect its energy markets to the interstate grid.  In doing so, Texas voluntarily took on the obligation not to discriminate against interstate commerce in the construction of the instrumentalities of interstate commerce on which it has chosen to rely for transmission.  Indeed, such discrimination is even more pernicious in this context than in the generation context since the costs of interstate transmission lines are allocated across multiple states.  Texas cannot connect to the interstate markets and force its sister states to subsidize

its preference to reserve new transmission lines to companies with "boots on the ground" in Texas.

*Tracy*'s "controlling weight" discussion does not alter that analysis in the slightest. In *Tracy*, the gas distributors were operating in two markets: They distributed a bundled product to captive local retail customers, and also sold gas to larger customers like General Motors in a competitive bulk market. When General Motors asked the Court to extend the tax exemption for sales to captive customers to sales to bulk customers, the Court rejected the argument that by allowing local distributors to participate in the bulk market, the state effectively forfeited its power to protect their local monopolies. *That* is all the Court meant when it declined to "accord controlling significance to the noncaptive market in which they compete." *Tracy*, 519 U.S. at 303.

That might matter if NextEra and LSP were trying to eliminate (or extend) a preference or special benefit in the *retail* markets simply because some Texas retail companies also own transmission. But that is not what is going on here. Instead, it is the state that claims it may extend its special powers in the *retail* market to an entirely different market, simply because that market has some connection to retail. It is as if, instead of declining to extend to bulk gas sellers the tax exemption for local monopoly sales, Ohio had created a tax exemption for wholesale sales of gas

by any Ohio-based entity. *Tracy* in no way excuses such blatant protectionism in an interstate market.

Nor does *Tracy* require courts to blindly defer to a state's view that a regulation is necessary to effectuate retail regulation. *Tennessee Wine* is again instructive. There was little dispute there that Tennessee's residency requirement impermissibly favored in-state interests, or that it would not survive Commerce Clause scrutiny if it concerned something "other than alcohol." 139 S. Ct. at 2462. Instead, the dispute was about whether the Twenty-First Amendment immunized the law from Commerce Clause scrutiny altogether. The Court held that even that constitutional amendment, reserving regulation of alcohol sales to the states, did not effect a categorical exception to the Commerce Clause for alcohol-related laws— even those related to health and safety. If a constitutional amendment cannot obviate the need to satisfy Commerce Clause scrutiny, it is hard to see how the Court's narrow decision in *Tracy* could do so.

Here, there are very good reasons to doubt Texas's claim that its law is necessary to "the provision of a reliable supply of electricity." ROA.3031-3032. In Order No. 1000, FERC expressly rejected the notion that incumbent protections advance reliability. *See* Order No. 1000 ¶¶260, 266, 342-44. Instead, FERC concluded that reliability is best addressed by simply requiring *every* applicant for a project—incumbent or otherwise—to "comply with all applicable reliability

standards." *Id.* ¶266. Moreover, Order No. 1000 provides that "reliability is an important factor that is considered during evaluation of a proposed transmission facility for potential selection." *Id.* ¶342. MISO's competitive evaluation of the Hartburg-Sabine line carried out FERC's reliability requirements, evaluating each competitor's operations and maintenance as part of its selection criteria. *See* Selection Report, *Hartburg-Sabine Junction 500 kV Competitive Transmission Project* (Nov. 27, 2018), *available at* https://bit.ly/2w8TEII. There is thus no support for Texas's reliability claims. In all events, those claims at most provide a basis for further exploration of whether Texas can overcome the rule of virtual *per se* invalidity for discriminatory laws.

Finally, the Eighth Circuit's recent decision upholding a similar law relies on reasoning inconsistent with Fifth Circuit and Supreme Court precedent and provides no valid basis to affirm. *See LSP Transmission Holdings, LLC v. Sieben*, No. 18-2559, 2020 WL 1443533 (8th Cir. Mar. 25, 2020). While the Eighth Circuit purported not to apply *Tracy*, it rejected the argument that Minnesota's law is discriminatory by emphasizing that the regulation of utilities generally, and the siting, permitting, and construction of transmission lines in particular, comes within

"state police power[s]."  *Id.* at *7.[1]  That ignores the scope of the Minnesota law, which, like Texas's law, goes well beyond the local siting, permitting, and construction of transmission lines generally to determine who is eligible to construct new facilities that are part of the *interstate* grid and paid for by out-of-state customers.

It also runs headlong into decades of precedent in the Supreme Court and this Court that make clear that a state's exercise of police powers begins, rather than ends, the Commerce Clause inquiry.  After all, states generally have plenary power, so nearly every state or local law the Supreme Court or this Court has invalidated under the Commerce Clause is one the state had the power to enact but for the Commerce Clause.  *See, e.g.*, *Tenn. Wine*, 139 S. Ct. at 2460; *C&A Carbone*, 511 U.S. at 392; *Dean Milk*, 340 U.S. at 356; *Cooper*, 11 F.3d at 553.  Certainly the Commerce Clause does not empower federal courts to inquire into the metes and bounds of state "police powers."  But neither does it excuse discrimination against interstate commerce just because an exercise of state power is not *ultra vires*.

In sum, the district court effectively bypassed any meaningful Commerce Clause analysis in reliance on *Tracy*.  But *Tracy* cannot save a law that restricts

---

[1] The Eighth Circuit also concluded that the law was not facially discriminatory because it discriminated in favor of incumbents, rather than in-state entities as such. As already explained, that argument is mistaken.  *Supra* pp.18-19.

competition in a non-local, non-monopoly, non-retail interstate market for the construction of new transmission lines. The Eighth Circuit, by contrast, eschewed reliance on *Tracy*, but reached much the same result by emphasizing that utility regulation is within the state's police power. But a century of Supreme Court caselaw makes clear that the police power does not empower states to enact discriminatory regulations of interstate commerce, including interstate energy markets. Indeed, the Court has rejected efforts to regulate interstate energy markets even when the state claimed such regulations were necessary to their local retail regulation.

Texas's law runs afoul of those precedents. It regulates who may own and operate *interstate* transmission facilities that will be paid for in part by out-of-state customers. And it does so in a manner that discriminates against out-of-state interests on its face, in its effects, and in its purpose. The law should therefore be enjoined, but at the very least, the Court should reverse and remand with instructions to evaluate on a full record whether the state can satisfy its demanding burden to justify this blatant discrimination.

## CONCLUSION

For the foregoing reasons, the Court should reverse.

Respectfully submitted,

s/Paul D. Clement
PAUL D. CLEMENT
 *Counsel of Record*

SARAH E. WILLIAMS
KIRKLAND & ELLIS LLP
609 Main Street
Houston, TX 77022
(713) 836-3600

ERIN E. MURPHY
KASDIN M. MITCHELL
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
paul.clement@kirkland.com

*Counsel for Amicus Curiae LSP Transmission Holdings II, LLC*

April 8, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement

**CERTIFICATE OF COMPLIANCE**

I certify that:

1) This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,471 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32.2.

2) This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

3) Any required privacy redactions have been made pursuant to Circuit Rule 25.2.13, the electronic submission is an exact copy of the paper submission, and the brief has been scanned for viruses using Windows Defender and is free of viruses.

April 8, 2020

s/Paul D. Clement
Paul D. Clement
