No. 20-50160

# In the United States Court of Appeals for the Fifth Circuit

NextEra Energy Capital Holdings, Incorporated;
NextEra Energy Transmission, L.L.C.; NextEra Energy
Transmission Midwest, L.L.C.; Lone Star Transmission,
L.L.C.; NextEra Energy Transmission Southwest, L.L.C.,

*Plaintiffs-Appellants*,

*v.*

Commissioner Arthur C. D'Andrea, Public Utility
Commission of Texas, in his official capacity;
Commissioner Shelly Botkin, Public Utility Commission
of Texas, in her official capacity; Chairman DeAnn T.
Walker, Public Utility Commission of Texas, in her
official capacity,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

## BRIEF FOR APPELLEES

Ken Paxton
Attorney General of Texas

Jeffrey C. Mateer
First Assistant Attorney General

Ryan L. Bangert
Deputy First Assistant
  Attorney General

Kyle D. Hawkins
Solicitor General

Lisa A. Bennett
Assistant Solicitor General
Lisa.Bennett@oag.texas.gov

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Counsel for Appellees

## CERTIFICATE OF INTERESTED PERSONS

No. 20-50160

NEXTERA ENERGY CAPITAL HOLDINGS, INCORPORATED;
NEXTERA ENERGY TRANSMISSION, L.L.C.; NEXTERA ENERGY
TRANSMISSION MIDWEST, L.L.C.; LONE STAR TRANSMISSION,
L.L.C.; NEXTERA ENERGY TRANSMISSION SOUTHWEST, L.L.C.,

*Plaintiffs-Appellants,*

*v.*

COMMISSIONER ARTHUR C. D'ANDREA, PUBLIC UTILITY
COMMISSION OF TEXAS, IN HIS OFFICIAL CAPACITY;
COMMISSIONER SHELLY BOTKIN, PUBLIC UTILITY COMMISSION
OF TEXAS, IN HER OFFICIAL CAPACITY; CHAIRMAN DEANN T.
WALKER, PUBLIC UTILITY COMMISSION OF TEXAS, IN HER
OFFICIAL CAPACITY,

*Defendants-Appellees.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, appellees, as governmental parties, need not furnish a certificate of interested persons.

/s/ Lisa A. Bennett
LISA A. BENNETT
*Counsel of Record for
Appellees*

i

## Statement Regarding Oral Argument

Oral argument is not necessary in this case. But if the Court determines argument would assist the Court, the State asks to participate.

# TABLE OF CONTENTS

Page

Certificate of Interested Persons ...................................................................i

Statement Regarding Oral Argument .........................................................ii

Table of Authorities ......................................................................................v

Introduction .................................................................................................. 1

Statement of Jurisdiction ............................................................................3

Issues Presented ...........................................................................................3

Statement of the Case ..................................................................................3

    I.   State and Federal Regulation of Electricity Transmission .........................3

    II.  State and Federal Rights of First Refusal .....................................7

    III. Projects Sought by NextEra .................................................. 10

    IV. Proceedings ...................................................................... 11

Summary of the Argument........................................................................ 12

Argument.................................................................................................... 14

    I.   NextEra Fails to State a Claim Under the Dormant Commerce
        Clause................................................................................ 14

        A.  SB 1938 does not discriminate against interstate commerce. ............ 16

            1.   As a threshold matter, the entities are not similarly situated. ...... 16

            2.   The statute does not facially discriminate. ..................................24

            3.   The statute was not enacted with a discriminatory purpose. ........28

            4.   The statute is not discriminatory in effect.................................34

        B.  Texas's right-of-first-refusal law survives scrutiny............................38

            1.   Texas's nondiscriminatory law survives *Pike* scrutiny. ..............39

            2.   Texas's law would even survive virtually *per se* scrutiny. ............ 41

    II.  NextEra Fails to State a Claim Under the Contracts Clause. ...................42

        A.  SB 1938 did not substantially impair a contractual
           relationship. ..................................................................... 43

        B.  SB 1938 furthers a significant and legitimate public purpose. ............46

C.  SB 1938 does not unreasonably adjust a contract in light of its significant and legitimate public purpose. ........................................... 47

III.  NextEra Is Not Entitled to a Preliminary Injunction. ............................... 48

Conclusion ........................................................................................................ 50

Certificate of Service ...................................................................................... 51

Certificate of Compliance ............................................................................. 51

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Abbott v. Perez,*
  138 S. Ct. 2305 (2018) ....................................................................... 31

*Allco Fin. Ltd. v. Klee,*
  861 F.3d 82 (2d Cir. 2017)...............................................17, 21, 23, 39

*Alliance of Auto. Mfrs., Inc. v. Currey,*
  984 F. Supp. 2d 32 (D. Conn. 2013), *aff'd,* 610 F. App'x 10 (2d
  Cir. 2015) ......................................................................................... 45

*Allied Structural Steel Co. v. Spannaus,*
  438 U.S. 234 (1978)........................................................................... 46

*Allstate Ins. Co. v. Abbott,*
  495 F.3d 151 (5th Cir. 2007) ...........................14- 15, 25, 28, 29, 31, 33, 34, 39, 40

*Am. Express Travel Related Servs., Inc. v. Sidamon-Eristoff,*
  669 F.3d 359 (3d Cir. 2012) .............................................................. 45

*Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n,*
  461 U.S. 375 (1983) ................................................................ 1, 5, 21, 49

*Bacchus Imports, Ltd. v. Dias,*
  468 U.S. 263 (1984) .......................................................................... 15

*Bradley v. Pub. Util. Comm'n,*
  289 U.S. 92 (1933) ....................................................................... 33-34

*Brown & Williamson Tobacco Corp. v. Pataki,*
  320 F.3d 200 (2d Cir. 2003)......................................................... 26, 35

*Buck v. Kuykendall,*
  267 U.S. 307 (1925)........................................................................... 26

*C&A Carbone, Inc. v. Town of Clarkstown,*
  511 U.S. 383 (1994) ..................................................................... 26, 27

*Camps Newfound/Owatonna, Inc. v. Town of Harrison,*
  520 U.S. 564 (1997)..............................................................14, 20, 41

*Churchill Downs Inc. v. Trout,*
  589 F. App'x 233 (5th Cir. 2014) (per curiam) ............................. 34-35

*Colon Health Ctrs. of Am., LLC v. Hazel*,
   813 F.3d 145 (4th Cir. 2016) ...................................................... 25, 37

*CTS Corp. v. Dynamics Corp. of Am.*,
   481 U.S. 69 (1987) ........................................................................ 39

*Dean Milk Co. v. City of Madison*
   340 U.S. 349 (1951) ............................................................... 26, 37

*DFW Metro Line Servs. v. Sw. Bell Tel. Co.*,
   901 F.2d 1267 (5th Cir. 1990) .................................................... 49

*Dep't of Revenue v. Davis*,
   553 U.S. 328 (2008) .................................................................... 15

*Dodge v. Bd. of Educ.*,
   302 U.S. 74 (1937) ...................................................................... 43

*Elec. Power Supply Ass'n v. Star*,
   904 F.3d 518 (7th Cir. 2018) ...................................................... 38

*Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*,
   459 U.S. 400 (1983) ......................................................... 42, 44, 46

*Entergy Tex. Inc. v. PUCT*,
   No. 03-18-00666-CV, 2019 WL 3519051 (Tex. App.—Austin Aug.
   2, 2019, no pet.) ................................................................ 7, 31, 44

*Exxon Corp. v. Governor of Maryland*,
   437 U.S. 117 (1978) ............................. 25, 29, 33, 34, 36, 38, 40

*Fla. Transp. Servs. v. Miami-Dade County*,
   703 F.3d 1230 (11th Cir. 2012) .................................................. 37

*Ford Motor Co. v. Tex. Dep't of Transp.*,
   264 F.3d 493 (5th Cir. 2001) ...........................................29, 34, 39, 40

*Gen. Motors Corp. v. Tracy*,
   519 U.S. 278 (1997) .............................................................*passim*

*Gen. Motors Corp. v. Romein*,
   503 U.S. 181 (1992) .................................................................... 43

*Granholm v. Heald*,
   544 U.S. 460 (2005) .............................................................. 15, 24

*Hawkeye Commodity Promotions, Inc. v. Vilsack*,
   486 F.3d 430 (8th Cir. 2007) ...................................................... 45

*Hudson Cty. Water Co. v. McCarter,*
   209 U.S. 349 (1908) ........................................................................ 46

*Huron Portland Cement Co. v. Detroit,*
   362 U.S. 440 (1960) ........................................................................ 21

*Ill. Commerce Comm'n v. FERC,*
   721 F.3d 764 (7th Cir. 2013) ........................................................ 39

*LSP Transmission Holdings, LLC v. Sieben,*
   No. 18-2559, 2020 WL 1443533 (8th Cir. Mar. 25, 2020) .......................... *passim*

*Maine v. Taylor,*
   477 U.S. 131 (1986) ........................................................................ 41

*Manigault v. Springs,*
   199 U.S. 473 (1905) ........................................................................ 46

*MISO Transmission Owners v. FERC,*
   819 F.3d 329 (7th Cir. 2016) ......................................... 1, 8, 9, 21, 40

*Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1,*
   554 U.S. 527 (2008) .......................................................................... 4

*New Energy Co. v. Limbach,*
   486 U.S. 269 (1988) ........................................................................ 41

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans,*
   491 U.S. 350 (1989) .................................................................. 21, 39

*New York v. FERC,*
   535 U.S. 1 (2002) ............................................................................ 21

*Office of Pub. Util. Counsel v. PUCT,*
   104 S.W.3d 225 (Tex. App.—Austin 2003, no pet.) .......................... 4

*Or. Waste Sys., Inc. v. Dep't of Envtl. Quality,*
   511 U.S. 93 (1994) .................................................................... 15, 41

*Piedmont Envtl. Council v. FERC,*
   558 F.3d 304 (4th Cir. 2009) .......................................................... 5

*Pike v. Bruce Church, Inc.,*
   397 U.S. 137 (1970) ......................................... 12, 13, 15, 38, 40, 47

*Planned Parenthood of Hous. & Se. Tex. v. Sanchez,*
   403 F.3d 324 (5th Cir. 2005) .......................................................... 48

*Powers v. United States,*
    783 F.3d 570 (5th Cir. 2015) ........................................................ 42

*PUCT v. Cities of Harlingen,*
    311 S.W.3d 610 (Tex. App.—Austin 2010, no pet.) .................................... 7, 28

*S. Cent. Timber Dev., Inc. v. Wunnicke,*
    467 U.S. 82 (1984) ................................................................ 27-28

*S.C. Pub. Serv. Auth. v. FERC,*
    762 F.3d 41 (D.C. Cir. 2014) (per curiam) ........................................... 2, 8

*Sherlock v. Alling,*
    93 U.S. 99 (1876) ...................................................................... 21

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas,*
    139 S. Ct. 2449 (2019) .................................................................. 24

*Tex. Commercial Energy v. TXU Energy, Inc.,*
    413 F.3d 503 (5th Cir. 2005) ............................................................ 6

*TXU Energy v. PUC,*
    165 S.W.3d 821 (Tex. App.—Austin 2005, pet. denied) ............................. 4

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt.*
    *Auth.,*
    550 U.S. 330 (2007) ........................................................... 14, 27, 38

*United Healthcare Ins. Co. v. Davis,*
    602 F.3d 618 (5th Cir. 2010) ..................................................... 44, 45

*Veasey v. Abbott,*
    830 F.3d 216 (5th Cir. 2016) (en banc) ............................................. 29

*Veix v. Sixth Ward Bldg. & Loan Ass'n,*
    310 U.S. 32 (1940) ..................................................................... 45

*Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n,*
    945 F.3d 206 (5th Cir. 2019) ..................... 24, 28, 29, 31, 32, 33, 34, 40

*Wyoming v. Oklahoma,*
    502 U.S. 437 (1992) .................................................................... 41

**Constitutional Provisions, Statutes, and Rules:**

U.S. Const.:
    art. I § 8, cl. 3 ............................................................. *passim*
    art. I § 10, cl. 1 ............................................................ *passim*

16 U.S.C.:
   §§ 791a et seq. .................................................................. 4
   § 824(b)(1) ............................................................. 4, 5, 39

28 U.S.C.:
   § 517 .............................................................................. 11
   § 1291 ............................................................................. 3
   § 1331 ............................................................................. 3

42 U.S.C.:
   § 7134 ............................................................................. 5
   § 7171(a) .......................................................................... 5

Minn. Stat. § 216B.246, subd. 2 .......................................... 9

N.D. Cent. Code § 49-03-02.2 ............................................ 9

Neb. Rev. Stat. § 70-1028 .................................................... 9

Okla. Stat. tit. 17, § 292 ...................................................... 9

S.D. Codified Laws § 49-32-20 ........................................... 9

Tex. Util. Code:
   § 11.002(b) .............................................................. 4, 17
   § 14.001 .......................................................................... 5
   §§ 31.001-43.152 ......................................................... 45
   § 31.001(b) ............................................................. 4, 18
   § 31.002(9) ..................................................................... 5
   § 36.001 ........................................................................ 18
   § 36.001(a) ..................................................................... 6
   § 36.051 ........................................................................ 18
   § 36.262(l)-(o) ............................................................. 24
   § 37.051 ............................................................. 9, 10, 12
   § 37.051(a) ................................................................. 1, 5
   § 37.051(e) .................................................................... 25
   § 37.051(g) ................................................................... 25
   § 37.053(a) ...................................................................... 1
   § 37.056 ................................................. 1, 9, 10, 12, 48
   § 37.056(c) ...................................................................... 5
   § 37.056(e) .................................................................... 23
   § 37.056(g) ................................................................... 23
   § 37.057 .................................................................... 1, 12

§ 37.151 ................................................................. 9, 10, 12

§ 37.151(1)-(2) ............................................................. 18

§ 37.154 ................................................................. 9, 10, 12

§ 37.154(a) ................................................ 1, 9, 24, 25, 36

§ 38.002 ...................................................................... 18

§ 39.001(a) ..................................................................... 4

§ 39.051 ......................................................................... 6

§ 39.051(b)(3) ................................................................. 6

§ 39.051(c) ...................................................................... 6

§ 39.102 ......................................................................... 6

§ 39.151 ......................................................................... 6

§ 39.151(j) ...................................................................... 7

§ 39.262(l)-(o) ............................................................. 36

§ 39.915 .................................................................. 24, 36

18 C.F.R. pt. 35 .............................................................. 2

16 Tex. Admin. Code:

ch. 25 .......................................................................... 45

§ 25.5(31) ...................................................................... 4

§ 25.5(33) ...................................................................... 4

§ 25.5(141) ..................................................................... 4

Fed. R. Civ. P. 12(b)(6) ............................................. 11, 29

**Other Authorities:**

ERCOT Nodal Protocols § 3.11.4.8(1) (July 1, 2019), *available at* http://www.ercot.com/content/wcm/current_guides/53528/03-070119_Nodal.docx ............................................... 7

*Midwest Indep. Transmission Sys. Operator, Inc., et al.,* 147 FERC ¶ 61,127 (May 15, 2014) ......................................... 8

*Midwest Indep. Transmission Sys. Operator, Inc., et al.,* 150 FERC ¶ 61,037 (Jan. 22, 2015) .......................................... 8

*NextEra Energy Transmission Midwest, LLC,* Order Granting Abandoned Plant Incentive, 166 FERC ¶ 61,169 (Mar. 5, 2019) ....................................................... 48

Order on Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities, 136 FERC ¶ 61,051 (July 21, 2011) (final rule) (Order 1000) ..............................*passim*

PUCT, *In re Brazos Elec. Power Coop., Inc. to Amend its Certificate of Convenience & Necessity for a 138-kV Transmission Line in Collin County*, Docket No. 46429 (Jan. 26, 2018), *available at* https://interchange.puc.texas.gov/Documents/ 46429_715_968092.PDF ................................................................5

PUCT, *Joint Pet. of Sw. Pub. Serv. Co. & Sw. Power Pool, Inc. for Declaratory Order*, 341 P.U.R.4th 195, 2017 WL 5068379 (Oct. 26, 2017) ........................................................................... 7, 44

PUCT, *Joint Report & Application of El Paso Elec. Co. et al.*, Docket No. 49849, *available at* https://interchange.puc.texas.gov/Docu- ments/49849_280_1050282.PDF ............................................. 36-37

Stipulation, PUCT Docket No. 48071, Item No. 80, *available at* https://interchange.puc.texas.gov/Documents/48071_80_995044 .PDF ...................................................................................... 10

Tex. S.B. 1938, Act of May 7, 2019, 86th Leg., R.S., ch. 44 (eff. May 16, 2019) ...........................................................................*passim*

Tex. H. Comm. On State Affairs, http://tlchouse.granicus.com/MediaPlayer.php?view_id=44&clip _id=16845 (start 07:47:45) (House testimony) ................................. 31

Tex. S. Comm. on Bus. & Commerce, http://tlcsenate.granicus.com/MediaPlayer.php?view_id=45&clip _id=14109 (start 0:00:00) (Senate testimony) ................................. 31

# Introduction

Regulation of utilities is "one of the most important of the functions traditionally associated with the police power of the States." *Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983). Texas exercises this power by regulating electric transmission throughout the State, including by setting rates for transmission and distribution services.

The Texas Legislature has concluded that it is in the public interest of Texans—for reasons of system reliability, efficiency, and cost to ratepayers—for new transmission lines to be built by the owners of the endpoint facilities to which the new lines will connect. Accordingly, the Legislature provided those utilities a right of first refusal to construct the new lines. Tex. S.B. 1938, Act of May 7, 2019, 86th Leg., R.S., ch. 44, § 4 (eff. May 16, 2019) (codified at Tex. Util. Code §§ 37.051(a), .053(a), .056, .057, .154(a)) [hereinafter "SB 1938"]. In doing so, the Legislature codified what has been the general practice in Texas for decades—consistently applied for transmission buildout and deviated from on only one occasion for the unique buildout of wind energy transmission in West Texas.

States' authority to enact rights of first refusal has been reaffirmed on numerous occasions—most recently by the Eighth Circuit, upholding a substantively-identical statute to the one challenged here. *See LSP Transmission Holdings, LLC v. Sieben*, No. 18-2559, 2020 WL 1443533, at *4 (8th Cir. Mar. 25, 2020) (rejecting dormant Commerce Clause challenge); *see also MISO Transmission Owners v. FERC*, 819 F.3d 329, 336 (7th Cir. 2016) (upholding FERC's approval of tariff including state right of first refusal). Indeed, even as FERC removed the *federal* right of first refusal in

2011, it reaffirmed that nothing in its rule was "intended to limit, preempt, or otherwise affect state or local laws," including "authority over siting or permitting of transmission facilities." *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 76 (D.C. Cir. 2014) (per curiam); Order on Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities, 136 FERC ¶ 61,051, paras. 256, 313 (July 21, 2011) (final rule) (codified at 18 C.F.R. pt. 35) [hereinafter "Order 1000"].

NextEra—a transmission-only company, not certificated in Texas—hopes to build a new transmission line in Texas from Hartburg to Sabine and purchase a transmission line in Texas from Jacksonville to Overton. Its hopes are contingent on approval by the Public Utility Commission of Texas ("PUCT"), which it has not received in either case. SB 1938 clarifies what was already the PUCT's general practice: NextEra cannot obtain these approvals. NextEra seeks to invalidate SB 1938 under the Constitution's dormant Commerce Clause and Contracts Clause.

The district court correctly held that neither claim was valid. No dormant Commerce Clause claim exists because the statute does not: distinguish between similarly-situated entities; discriminate facially, by purpose, or by effect; or unduly burden interstate commerce. No Contracts Clause claim exists because any impact of the Texas statute on NextEra's contingent hopes, formed in the context of a fully-regulated market and in the face of historical practice, does not substantially impair a vested contract right or outstrip the legitimate and substantial state interests served. The Court should affirm.

## Statement of Jurisdiction

The district court had jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction). This Court has appellate jurisdiction under 28 U.S.C. § 1291. ROA.3036-37 (February 26, 2020, order and final judgment); ROA.3038-39 (NextEra's February 28, 2020, notice of appeal).

## Issues Presented

SB 1938 clarified that owners of existing endpoint facilities have a right of first refusal for construction of new transmission that will connect to those endpoints. The issues presented are:

1. Whether NextEra states a claim under the dormant Commerce Clause where Texas's law distinguishes between incumbent utilities and non-incumbent transmission-only companies.

2. Whether NextEra states a claim under the Contracts Clause where the allegedly-impaired contract was expressly contingent on PUCT approval.

3. Whether the district court properly dismissed NextEra's motion for preliminary injunction, having dismissed NextEra's claims.

## Statement of the Case

### I.  State and Federal Regulation of Electricity Transmission

Electricity production and sale is comprised of three parts: generation, transmission-and-distribution, and retail. Electricity is delivered to consumers on-demand and, because storage is inefficient, it must be placed on the grid once it is generated. Thus, building and maintaining the necessary infrastructure at the middle step—transmission and distribution—is critical to the stability and reliability of the grid.

*See TXU Energy v. PUC*, 165 S.W.3d 821, 827 (Tex. App.—Austin 2005, pet. denied).[1]

The traditional business structure in the electricity sector is the vertically-integrated utility—wherein one utility provides generation, transmission-and-distribution, and retail services within a defined service area. More recently, some jurisdictions have decoupled these three stages.

In either case, transmission is characterized by natural monopoly. *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 536 (2008); *TXU*, 165 S.W.3d at 827. The Texas Legislature recognizes both vertically-integrated utilities and transmission-and-distribution utilities as monopolies. *E.g.*, Tex. Util. Code §§ 11.002(b), 31.001(b), 39.001(a). In the monopoly utility market, "the normal forces of competition that regulate prices in a free enterprise society do not operate." *Id.* § 11.002(b). Therefore, "[p]ublic agencies regulate utility rates, operations, and services as a substitute for competition." *Id.*; *see also Office of Pub. Util. Counsel v. PUCT*, 104 S.W.3d 225, 227-28 (Tex. App.—Austin 2003, no pet.) (describing this as a "regulatory compact" with the public).

State and federal regulation of electricity occupy separate spheres. The federal government, under the Federal Power Act, regulates rates and services of interstate transmission of electricity and electricity sale at wholesale. 16 U.S.C. § 824(b)(1). An independent agency, the Federal Energy Regulatory Commission ("FERC")

---

[1] Transmission services transport electricity at higher voltage, *see* 16 Tex. Admin. Code § 25.5(141), while distribution services transport electricity over lower-voltage lines from the transmission system to end users, *see id.* § 25.5(31), (33).

administers these responsibilities. 42 U.S.C. §§ 7134, 7171(a). With FERC approval of their tariffs, independent system operators and regional transmission organizations (collectively, "ISOs") coordinate and monitor interstate transmission grids. *See* Tex. Util. Code § 31.002(9).

States retain jurisdiction over retail sales of electricity and "over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce." 16 U.S.C. § 824(b)(1). This includes "jurisdiction to approve or deny permits for the siting and construction of electric transmission facilities." *Piedmont Envtl. Council v. FERC*, 558 F.3d 304, 310 (4th Cir. 2009). "As a result, the nation's transmission grid is an interconnected patchwork of state-authorized facilities." *Id.* State regulation of the electric industry has long been recognized as a core component of the States' police powers. *See Ark. Elec. Coop.*, 461 U.S. at 377.

The Texas regulator is the PUCT. Tex. Util. Code § 14.001. All utilities in Texas must obtain a certificate of convenience and necessity ("Certificate") from the PUCT "that states that the public convenience and necessity requires or will require the installation, operation, or extension of the service." *Id.* § 37.051(a). The PUCT weighs a variety of factors including the cost to consumers and the adequacy of existing service. *Id.* § 37.056(c). The Certificate process is independent of the evaluations done by ISOs; the PUCT considers their recommendation for new lines but is not bound to approve any line. *See, e.g.*, PUCT, *In re Brazos Elec. Power Coop., Inc. to Amend its Certificate of Convenience & Necessity for a 138-kV Transmission Line in Collin County*, Docket No. 46429 (Jan. 26, 2018), *available at* https://interchange.puc.texas.gov/Documents/46429_715_968092.PDF (denying Certificate).

In Texas, electricity services are structured differently depending on region. Texas includes parts of all three of the nation's grids: the eastern, the western, and Electric Reliability Council of Texas ("ERCOT") interconnections.

In the eastern interconnection areas of Texas that are at issue in this case, the traditional vertically-integrated utility model remains—and with it, traditional regulation. The Midcontinent Independent System Operator ("MISO") and the Southwest Power Pool ("SPP") are the ISOs for the relevant areas. ROA.33. Texas utilities that are members of MISO and SPP are subject to concurrent PUCT and FERC jurisdiction. ROA.33-34. The PUCT approves utility investments and sets retail rates in these areas—which include the transmission component—and the utilities' costs and revenues are passed through to a captive consumer base in their service areas.

ERCOT comprises 75% of Texas's land area and 90% of its electric use. ROA.33; ROA.2058. The ERCOT grid is located entirely in Texas and has only limited asynchronous ties to other grids, so it is not involved in interstate transmission and not subject to FERC rate jurisdiction. *Tex. Commercial Energy v. TXU Energy, Inc.*, 413 F.3d 503, 506 n.1 (5th Cir. 2005). ERCOT functions as its own ISO, Tex. Util. Code § 39.151, and is subject to oversight by the PUCT and the Texas Legislature, ROA.2058. In ERCOT, the Legislature deregulated the generation and retail aspects of electricity and allowed customer choice. Tex. Util. Code §§ 39.051, .102. But the transmission-and-distribution function is still subject to traditional regulation. *Id.* § 39.051(b)(3), (c). The PUCT sets transmission rates, and those rates are passed through to end-consumers. *Id.* § 36.001(a).

## II.  State and Federal Rights of First Refusal

Texas's general practice, going back decades, has been that owners of existing endpoint facilities build new connecting lines. In the MISO and SPP areas of Texas, utilities are vertically-integrated and transmission has *never* been built by a transmission-only entity. A 2017 PUCT declaratory order would have found it permissible for transmission-only utilities to build lines in these regions, but no such projects came to fruition and, indeed, disapproval of that agency order was a driving factor behind the Legislature's enactment of the clarifying law challenged here. *See* PUCT, *J. Pet. of Sw. Pub. Serv. Co. & Sw. Power Pool, Inc. for Declaratory Order*, 341 P.U.R.4th 195, 2017 WL 5068379, at *12 (Oct. 26, 2017). An appeal of the PUCT's declaratory order was mooted by SB 1938. *Entergy Tex. Inc. v. PUCT,* No. 03-18-00666-CV, 2019 WL 3519051, at *1 (Tex. App.—Austin Aug. 2, 2019, no pet.).

That endpoint owners construct new transmission is the general practice in ERCOT as well. It has been memorialized in the statutorily-binding ERCOT Protocols since 2011. *See* Tex. Util. Code § 39.151(j); ERCOT Nodal Protocols § 3.11.4.8(1) (July 1, 2019), *available at* http://www.ercot.com/content/wcm/current_guides/53528/03-070119_Nodal.docx. Before that, it was in the ERCOT Regional Planning Group Charter. ROA.2064. There has been only one exception to this practice within ERCOT: the unique buildout of transmission lines in the Competitive Renewable Energy Zone to deliver wind power from West Texas to population centers. ROA.34-35; *see also PUCT v. Cities of Harlingen*, 311 S.W.3d 610, 619-20 (Tex. App.—Austin 2010, no pet.) (interpreting plain text of prior version of statute).

Historically, a separate federal right of first refusal existed for projects under FERC jurisdiction. In 2011, FERC eliminated the federal right in Order 1000, requiring ISOs to "eliminate" such provisions in "[FERC]-jurisdictional tariffs." Order 1000, at ¶ 313. This instruction applied only to "cost allocation" projects, and not baseline reliability projects. *Id.*; *see MISO Transmission Owners*, 819 F.3d at 335-37.

FERC did not alter state rights of first refusal in Order 1000. The order states that "nothing in this Final Rule is intended to limit, preempt, or otherwise affect state or local laws or regulations with respect to construction of transmission facilities, including but not limited to authority over siting or permitting of transmission facilities." Order 1000, at ¶ 227. The D.C. Circuit observed that Order 1000 "take[s] great pains to avoid intrusion on the traditional role of the States" and explained that "[e]ven if the Commission's mandate opens up opportunities for non-incumbents, such developers must still comply with state law." *S.C. Pub. Serv. Auth.*, 762 F.3d at 76.

Thus, while ISOs were instructed to remove federal rights of first refusal from their tariffs, those tariffs still include any state-created rights of first refusal. ROA.42. FERC has subsequently approved tariffs that include state rights of first refusal, including in MISO. *Midwest Indep. Transmission Sys. Operator, Inc., et al.,* 147 FERC ¶ 61,127, para. 149 (May 15, 2014). There, FERC "conclude[d] that the Commission should not prohibit MISO from recognizing state and local laws and regulations as a threshold issue." *Id.*; *see also Midwest Indep. Transmission Sys. Operator, Inc., et al.,* 150 FERC ¶ 61,037, para. 25 (Jan. 22, 2015) (denying rehearing). The Seventh Circuit upheld FERC's determination, and stressed that FERC's desire "to avoid

intrusion on the traditional role of the States in regulating the siting and construction of transmission facilities" is a "proper goal." *MISO Transmission Owners*, 819 F.3d at 336.

Order 1000 reflects FERC's policy judgment that, on balance, eliminating the federal right of first refusal would promote cost savings. *See, e.g.*, Order 1000, at ¶ 253. FERC also noted potential downsides, including a concern that eliminating the federal right "could adversely impact the collaborative nature of current regional transmission planning processes." *Id.* ¶ 258. Indeed, Commissioner Moeller filed a partial dissent based on concerns about regional cooperation and reliability. *Id.*

Following Order 1000, several States have made the opposite policy judgment—enacting or retaining state rights of first refusal. *See, e.g.*, Minn. Stat. § 216B.246, subd. 2; Neb. Rev. Stat. § 70-1028; N.D. Cent. Code § 49-03-02.2; Okla. Stat. tit. 17, § 292; S.D. Codified Laws § 49-32-20. The Minnesota statute has been upheld by the Eighth Circuit during the pendency of this appeal. *See LSP Transmission Holdings*, 2020 WL 1443533, at *8.

In Texas, the Legislature passed SB 1938 to clarify and codify Texas's right-of-first-refusal practice. The bill amends Texas Utilities Code sections 37.051, 37.056, 37.151, and 37.154. Section 37.051 provides that the PUCT will grant a Certificate for new transmission to the endpoint owners. And section 37.154(a) allows the endpoint owner to transfer its rights to another utility under specified circumstances. Tex. Util. Code § 37.154(a).

### III. Projects Sought by NextEra

NextEra seeks two transmission projects in Texas. The first, which has been the focus of this litigation, is the Hartburg-Sabine line, located in the MISO area of Texas. ROA.30. That project would consist of five new high-voltage transmission lines and one new substation, which would interconnect with Entergy Texas's transmission system. ROA.2160. NextEra subsidiary NextEra Midwest—a transmission-only entity—entered into a "Selected Developer Agreement" with MISO on January 25, 2019. ROA.53. That agreement reflects MISO's selection of NextEra Midwest's bid. ROA.53; *see also* ROA.2161 (MISO Selection Report (Nov. 27, 2018). The Selected Developer Agreement requires NextEra Midwest to secure a Certificate from the PUCT. ROA.53. While NextEra represents (at 14) that it "anticipated" being able to receive that Certificate, it has not applied for or received a Certificate.

The second project is the potential purchase of the Jacksonville-Overton line, located in the SPP area of Texas. ROA.31. NextEra Southwest—another transmission-only subsidiary of NextEra—applied to the PUCT for a transfer of the Certificate rights. ROA.31. PUCT staff signed a stipulation in October 2018 recommending approval, but the transfer has not been approved to-date and the stipulation has been questioned by at least two Commissioners. Stipulation, PUCT Docket No. 48071, Item No. 80, *available at* https://interchange.puc.texas.gov/Documents/48071_80_995044.PDF; ROA.1754-56.

## IV. Proceedings

NextEra sued, seeking facial invalidation of Utilities Code sections 37.051, 37.056, 37.151, and 37.154, as amended by SB 1938. ROA.27-61. NextEra seeks declaratory and injunctive relief under the Commerce Clause, U.S. Const. art. I, § 8, cl. 3, and the Contracts Clause, U.S. Const. art. I, § 10, cl. 1. ROA.29, 55-59. NextEra also sought a preliminary injunction. ROA.73-84.

The Commissioners moved to dismiss. ROA.1851-73; Fed. R. Civ. P. 12(b)(6). NextEra filed an opposition, ROA.2826, and the Antitrust Division of the U.S. Department of Justice filed a Statement of Interest supporting NextEra. ROA.2884-2906; 28 U.S.C. § 517. FERC has not participated in this case.

The district court granted the motion to dismiss. ROA.3036-37. With respect to the dormant Commerce Clause, it held that the claim could be dismissed under *Gen. Motors Corp. v. Tracy*, 519 U.S. 278 (1997), for three reasons: (1) the Supreme Court had afforded "controlling weight to the monopoly market, which is also the market in Texas;" (2) "Texas is entitled to consider the effect on the consumers that the utilities serve;" and (3) "existing regulated transmission-line providers with a right of first refusal are not similarly situated with unregulated providers such as NextEra." ROA.3031-32.

The court further held that the statute did not discriminate against interstate commerce facially, through its purpose, or in effect. ROA.3031-33. It found that SB 1938 facially drew distinctions based on incumbency, not geography, and rejected NextEra's attempted analogy to "flow control" cases. ROA.3050. The court found no discriminatory purpose, instead finding that the Legislature acted to clarify Texas

law in the wake of the PUCT's erroneous 2017 declaratory order. ROA.3033. Finally, it found no discriminatory effect, noting that most incumbent providers are out-of-state companies themselves and that non-incumbents (either from in-state or out-of-state) have the same path to enter the market.

Having found no discrimination, the district court further found that any burden imposed by SB 1938 was not "clearly excessive in relation to the putative local benefits." ROA.3033-34; *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

The district court also rejected NextEra's Contracts Clause claim. It held that "NextEra Midwest's contractual right to build the Hartburg-Sabine line was subject to obtaining the necessary regulatory approvals, including from PUCT" and that "to the extent, if any, SB 1938 impairs NextEra Midwest's contractual interests, SB 1938 rests on, and is prompted by, significant and legitimate state interests." ROA.3035.

Having dismissed NextEra's claims, the district court cancelled the scheduled hearing concerning the preliminary injunction, ROA.601, 2815-16, 3123-24, and denied NextEra's request for a preliminary injunction, ROA.3036. NextEra appealed. ROA.3038.

## Summary of the Argument

Texas's state right of first refusal for endpoint owners of new transmission—which the challenged SB 1938 codified and clarified—does not violate the dormant Commerce Clause for two main reasons.

To begin, taken collectively, sections 37.051, 37.056, 37.057, 37.151, and 37.154, as amended by SB 1938, create an even-handed scheme that regulates transmission services in Texas in order to foster the delivery of reliable electric power in the State.

Thus, this scheme does not discriminate against interstate commerce. The vertically-integrated monopoly utilities against whom NextEra compares itself are not "similarly situated" entities, so Texas may distinguish between the two without running afoul of the dormant Commerce Clause. *See Tracy*, 519 U.S. at 299.

Nor do these laws discriminate facially, in purpose, or in effect. Facially, no instate versus out-of-state distinction is made. The scheme's nondiscriminatory purpose was to continue the cost- and system-reliability advantages of allowing existing transmission providers to develop Texas's critical transmission infrastructure. And it does not have a discriminatory effect on out-of-state entities—indeed, most of the favored existing transmission providers are controlled by out-of-state entities, and some disfavored transmission providers are Texas-owned. In short, Texas's right-of-first-refusal law is not protectionist.

Second, NextEra's challenge fails because the laws survive scrutiny. As non-discriminatory laws, the appropriate standard is articulated in *Pike*, 397 U.S. at 142. Because any incidental burden on interstate commerce is not "clearly excessive in relation to the putative local benefits," *id.*, the law should be upheld.

NextEra's Contracts Clause claim likewise fails. NextEra has no vested contract right—only an expectation—to build or own the lines it seeks. And its rights were always subject to new standards in the heavily-regulated electric-utility industry. Those regulations advance substantial and legitimate State purposes.

Accordingly, the district court's dismissal of NextEra's complaint for failure to state a claim should be affirmed. And because the case was correctly dismissed, the

dismissal of NextEra's motion for preliminary injunction should likewise be affirmed.

**ARGUMENT**

## I.   NextEra Fails to State a Claim Under the Dormant Commerce Clause.

The Commerce Clause provides that "Congress shall have Power … [t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. The negative, or "dormant," implication of that clause is that the State may not enact laws that discriminate against or unduly burden interstate commerce. *Tracy*, 519 U.S. at 287.[2]

Dormant Commerce Clause analysis is concerned only with "interstate commerce." So as an initial matter, NextEra's request for a declaration and injunction striking down the amended Utility Code provisions, ROA.59-60, is erroneously over-inclusive since the challenged provisions also apply in the ERCOT region, an *intrastate* grid constituting 90 percent of Texas's energy use. Despite mounting a facial challenge, acknowledges that its arguments do not apply in ERCOT. Appellants' Br. 38 (stating that FERC-regulated interstate market is the "only market at issue").

Fundamentally, though, NextEra's dormant Commerce Clause challenge fails no matter the region of Texas because a right of first refusal for incumbent utilities

---

[2] The judicially-created dormant Commerce Clause is not without its critics. *See Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 609-10 (1997) (Thomas, J., dissenting); *see also id.* at 595 (Scalia, J., dissenting).

does not amount to "simple economic protectionism." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 343 (2007) (plurality op.).

The first tier of the dormant Commerce Clause analysis asks whether the challenged statute discriminates against interstate commerce. *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 160 (5th Cir. 2007). State laws invite scrutiny if they mandate "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Granholm v. Heald*, 544 U.S. 460, 472 (2005). "Conceptually, of course, any notion of discrimination assumes a comparison of substantially similar entities." *Tracy*, 519 U.S. at 298. If the entities are substantially similar, the Court evaluates whether the statute "discriminates against interstate commerce either facially, by purpose, or by effect." *Allstate*, 495 F.3d at 160 & n.22 (citing *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984)).

At the second tier of the analysis, the Court applies the appropriate level of scrutiny. If the law does not discriminate, it survives unless the incidental burden on interstate commerce "is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142. On the other hand, if the law was found to discriminate against interstate commerce, it is virtually *per se* invalid—though it may still survive if it "'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.'" *Dep't of Revenue v. Davis*, 553 U.S. 328, 338 (2008) (quoting *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 101 (1994)).

## A. SB 1938 does not discriminate against interstate commerce.

Texas's right-of-first-refusal law does not discriminate against interstate commerce. The Eighth Circuit recently upheld a functionally-identical Minnesota right-of-first-refusal law in the face of a dormant Commerce Clause challenge. *LSP Transmission Holdings*, 2020 WL 1443533, at *1.

There are two avenues by which this Court can conclude that the Texas statute does not discriminate. It can hold, as a threshold matter, that the entities the law distinguishes are not similarly situated. Instead, or in addition, it can hold that the law does not discriminate facially, in purpose, or in effect. *See id.* at *3-4 (ruling on this basis). The district court considered both avenues and properly rejected NextEra's claim on both grounds. ROA.3030-33.

### 1.   As a threshold matter, the entities are not similarly situated.

In *Tracy*, the Supreme Court explained that whether "allegedly competing entities" are "similarly situated for constitutional purposes" is a "threshold question" in determining whether differential treatment of those entities should be evaluated under the dormant Commerce Clause discrimination framework. 519 U.S. at 299. Here, the incumbent utilities given a right of first refusal are not similarly situated to transmission-only providers like NextEra.

*Tracy* involved a dormant Commerce Clause claim based on Ohio's differential tax treatment of sales of natural gas by regulated domestic utilities and interstate gas companies in the competitive market. *Id.* at 304. Ohio gave a tax exemption to the state-regulated monopolistic entities but not to the independent non-state-regulated

marketers. *Id.* The Supreme Court upheld the Ohio law. *Id.* at 312. Because Texas's electricity market is analogous, applying the *Tracy* analysis leads to the same result.

First, the *Tracy* Court found that the regulated domestic utilities and interstate gas companies—while both selling natural gas—nonetheless sold different products. Those products were: (1) natural gas that was "bundled" with "services and protections" to ensure reliability and stable rates; and (2) "unbundled" natural gas sold without these protections. *Id.* at 297; *see also Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 105-07 (2d Cir. 2017) (holding that Connecticut renewable energy credits were a "class" of credit that "differs from" a Georgia facility's credits). Applying that understanding of "different products" here, the "bundled" and "unbundled" concepts are equally pertinent: the highly-regulated vertically-integrated utilities in Texas's MISO and SPP regions sell transmission service that is "bundled" with regulatory obligations and protections for their service areas, while transmission service provided by transmission-only entities would be "unbundled" from such obligations. The Court should reject NextEra's contention (at 39) that these are "identical products."

Second, the *Tracy* Court explained that the "bundled" natural gas served a "captive" market, comprised primarily of residential customers who cannot readily bear risks or fluctuations related to their supply or costs. 519 U.S. at 301. The "unbundled" product, on the other hand, served a "noncaptive" market, primarily comprised of bulk buyers who have more elasticity and ability to switch to other fuels or sources. *Id.* at 302-03. The *Tracy* Court found that the difference in products meant

17

that the entities would continue to "serve different markets" "even if the suppos-edly discriminatory burden were removed." *Id*. at 299.

Like the market in *Tracy*, there is a captive market that only the incumbent enti-ties serve in Texas. These utilities are monopolies in their service areas and provide "fully bundled" service to captive end-use customers. *See* ROA.3071 ("[C]aptive ratepayers shoulder the cost of new transmission infrastructure, plus a guaranteed return on investment for the utility[.]"); *see also* Tex. Util. Code §§ 11.002(b), 31.001(b). The monopoly status of Texas electric utilities is *especially* clear in the SPP and MISO areas in which NextEra seeks its projects—where utilities are tradition-ally structured to provide generation, transmission-and-distribution, and retail. Con-trary to the DOJ's broad contention (at 2), "the idea that electric utilities are natural monopolies" has *not* "unraveled" or opened "to more competition" in the SPP and MISO areas of Texas. Those incumbent vertically-integrated utilities (like the local gas utilities in *Tracy*) are subject to pervasive state regulation over their retail rates and services, Tex. Util. Code §§ 36.051, 38.002, and have an obligation to serve "every consumer in the utility's certificated area" and "provide continuous and ad-equate service in that area," *id.* § 37.151(1)-(2).

NextEra's argument (at 39 n.10) that the captive market should be ignored be-cause not *every* favored incumbent has retail jurisdiction is misleading. All investor-owned utilities in the MISO and SPP areas are fully vertically-integrated, including retail service. NextEra is presumably referring to entities in MISO and SPP that are structured as generation and transmission cooperatives, meaning that they are made up of cooperative members that distribute electricity to their respective service

areas. Ultimately, the cooperative and its constituent members together provide gen-eration, transmission, and retail. Additionally, even where the three phases are pro-vided by different entities, as in ERCOT, the transmission-and-distribution portion of the market is characterized by monopoly conditions and subjected to traditional rate regulation. *See* Tex. Util. Code § 36.001.

The third step in the *Tracy* analysis—which asks whether there is also a market in which the entities compete, 519 U.S. at 303—is easier here than it was in that case. That is because there is no competitive market for transmission sales in Texas. In *Tracy*, a non-captive market existed where sellers of bundled and unbundled prod-ucts competed for industrial customers, with bulk-consumers' prices being set by market forces. There is no analogous competitive market here—amounts paid to Texas transmission providers for their service are set by regulators, not by market forces. Transmission in Texas is *always* a regulated market with PUCT-set rates, *even* in the otherwise-competitive ERCOT region.

It is true that NextEra competed with other transmission providers for *selection* by MISO. But selection by the relevant ISO in a competitive bidding process does not confer the right to *build* the line; that remains the State's to give. Texas's general practice—which has always been followed in the MISO and SPP areas—is to permit endpoint owners to build new transmission, so transmission-only entities in these regions have *never* competed with incumbent utilities for the right to build transmis-sion lines, even before SB 1938. And even putting aside this history, any sense in which NextEra could compete with incumbent utilities would only be to obtain

regulatory approvals from an ISO and from the PUCT, rather than to compete for customers, with rates that are set by the market, in the sense contemplated in *Tracy*.

NextEra goes too far when it contends (at 38-39) not only that this competition constitutes a "market" under *Tracy*, but that it is the "one" and "only" market for transmission in the relevant regions. That claim is patently erroneous given the existence of the captive market already described in this brief. NextEra also undermines its own argument (at 38) by claiming that the appropriate delineation of the market to which the Court should be looking is the interstate "market regulated by FERC." Of course, this case concerns market regulation by the PUCT, not FERC; state right-of-first-refusal statutes for the building of transmission were *not* preempted in FERC's Order 1000.[3]

Fourth, the *Tracy* analysis asks which market should be given controlling significance. 519 U.S. at 303-04. *Tracy* concluded: "Although there is no *a priori* answer, a number of reasons support a decision to give the greater weight to the captive market and the local utilities' singular role in serving it, and hence to treat [independent] marketers and [utilities] as dissimilar for present purposes." *Id.* at 304. The reasons supporting giving weight to the utility market were so strong in the public utility context that Justice Scalia, writing for four Justices, subsequently described the "controlling significance" the *Tracy* Court afforded to the captive market as "effectively

---

[3] NextEra suggests (at 40) that the Commissioners have argued that because FERC has not preempted a state law, that law is "insulate[d] . . . from a Commerce Clause challenge." Not so. NextEra misplaces reliance on the notion that FERC jurisdiction extends to transmission buildout within Texas.

creat[ing] what might be called a 'public utilities' exception to the negative Commerce Clause." *Camps Newfound,* 520 U.S. at 607 (Scalia, J., dissenting). Even if the Court does not read *Tracy* to create such an exception in *every* public utility case, applying the reasons given in *Tracy* in *this* case can result in only one conclusion: that controlling significance should be given to the captive utility market in Texas, in which transmission-only entities like NextEra do *not* compete with incumbent utilities. *See* ROA.3032.

A primary consideration was the Court's "traditional recognition of the need to accommodate state health and safety regulation in applying dormant Commerce Clause principles." *Tracy,* 519 U.S. at 306-07. The Supreme Court has "consistently recognized the legitimate state pursuit of such interests as compatible with the Commerce Clause, which was 'never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country.'" *Id.* (citing *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 443-44 (1960) (quoting *Sherlock v. Alling*, 93 U.S. 99, 103 (1876)).

Contrary to NextEra's suggestion (at 36-37) that traditional health and safety concerns are not implicated here, state regulation of electric utilities has long been recognized as a core police power. *New York v. FERC*, 535 U.S. 1, 24 (2002); *Ark. Elec. Coop.*, 461 U.S. at 377; *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 365 (1989); *Allco*, 861 F.3d at 106. And at least two other Circuits have specifically recognized the "traditional role of the States in regulating the siting and construction of [electric] transmission facilities." *LSP Transmission*

*Holdings*, 2020 WL 1443533, at \*2; *MISO Transmission Owners*, 819 F.3d at 337. Here, both the "means and ends" of the Texas program are "well within the scope of what Congress and FERC have traditionally allowed the States to do in the realm of energy regulation." *Allco*, 861 F.3d at 106.

The Supreme Court additionally reasoned that intervention in the public utility area could have negative consequences. "[T]he importance of traditional regulated service to the captive market makes a powerful case against any judicial treatment that might jeopardize [the utilities'] continuing capacity to serve the captive market." *Tracy*, 519 U.S. at 304. If state-regulated utilities were forced to compete on a level playing field with interstate marketers, the Court was concerned that the increased competition between the two kinds of sellers in the noncaptive market (for the largest customers), would, in turn, jeopardize the utilities' "ability to continue to serve the captive market where there is no such competition." *Id.* at 307. While the *Tracy* Court believed that eliminating the challenged law might be a net positive for consumers, *id.* at 307-08, it *still* upheld the law because even the mere possibility of a negative impact on energy distribution to consumers was enough to justify upholding it, *id.* at 309. Likewise here, the balance Texas strikes between incumbents' right of first refusal and regulatory burdens on those owners could be upset by judicial intervention here. The legislative history of SB 1938 amply demonstrates that there is at least a possibility that eliminating the state right of first refusal could lead to negative consequences. *See infra* Section I.A.3; *see also* Order 1000 (Comm'r Moeller, dissenting).

Further, the *Tracy* Court explained that the courts were "institutionally un-suited to gather the facts upon which economic predictions can be made." 519 U.S. at 308-09 (stating that the courts were thus "ill qualified to develop Commerce Clause doctrine dependent on . . . predictive judgments" about economic conse-quences). Here, too, the build-out of transmission involves these kinds of predic-tions. Thus, while NextEra believes (at 56-57) that eliminating Texas's right of first refusal would benefit consumers, that is a policy determination properly left to leg-islators, not to the courts and certainly not to NextEra itself. Indeed, Congress has acted extensively in the area of electricity regulation and preserved state authority in this area, and FERC has indicated that Texas retains the policy decision whether to adopt a right of first refusal. Those entities, and the Texas Legislature, are "better-situated than the courts" to "determine the economic wisdom and the health and safety effects" of a decision on the correct balance between competition and a right of first refusal in the area of building of electric transmission facilities. *See Allco*, 861 F.3d at 107.

In sum, as in *Tracy*, Texas's "regulatory response to the needs of the local [elec-tric] market has resulted in a noncompetitive bundled [] product that distinguishes its regulated sellers from independent marketers to the point that the enterprises should not be considered 'similarly situated' for purposes of a claim of facial discrim-ination under the Commerce Clause." 519 U.S. at 310.

### 2.    The statute does not facially discriminate.

SB 1938 does not discriminate against interstate commerce on its face. *See* ROA.3031-32; *LSP Transmission Holdings*, 2020 WL 1443533, at *4 (rejecting substantially identical claim).

The challenged law provides that "[a] certificate to build, own, or operate a new transmission facility that directly interconnects with an existing electric utility facility . . . may be granted only to the owner of that existing facility." Tex. Util. Code § 37.056(e). The utility authorized to build and operate the transmission line may, instead of building the line itself, seek to designate another provider that is currently certificated in the power region to build the line, subject to Commission approval. *Id.* § 37.056(g). A Certificate may be sold, assigned, or leased where "the purchaser, assignee, or lessee is already certificated by the [C]ommission to provide electric service within the same electric power region[,]" or "[a]s part of a transaction subject to Sections 36.262(l)-(o) and 39.915," which govern sales and mergers of incumbent utilities. *Id.* § 37.154(a).

Texas's law "draws a neutral distinction between existing electric transmission owners whose facilities will connect to a new line and all other entities, regardless of whether they are in-state or out-of-state." *LSP Transmission Holdings*, 2020 WL 1443533, at *5. It requires that new transmission be built by the endpoint owners "irrespective of domicile." *Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 945 F.3d 206, 214 (5th Cir. 2019).

NextEra first argues that SB 1938 imposes a "blatant in-state presence requirement" of the type struck down in *Tennessee Wine* and *Granholm*. Appellants' Br. 29.

*Tennessee Wine* struck down a Tennessee law placing a direct durational-residency requirement on anyone seeking to obtain or renew a license to operate a liquor store in the state. *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2457 (2019). And *Granholm* also involved "obvious" protectionism on behalf of in-state wineries, invalidating a Michigan law that required wine to go through in-state wholesalers and retailers (thus driving up the price of the goods) and a New York law that not only required construction of an in-state facility to directly sell wine but also denied out-of-state wineries the best type of sales license even if they were to build such facilities. 544 U.S. at 473-76.

SB 1938 is unlike those statutes. An incumbency requirement is not the same as a residence requirement. An "incumbency bias" is "not a surrogate for" a negative impact on interstate commerce. *Colon Health Ctrs. of Am., LLC v. Hazel*, 813 F.3d 145, 154 (4th Cir. 2016) (explaining that "incumbency is not the focus of the dormant Commerce Clause" and upholding State's issuance of medical certificates of need to incumbents); *see also LSP Transmission Holdings*, 2020 WL 1443533, at *4. The dormant Commerce Clause also does not prohibit distinctions based on business form. *See Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 125 (1978); *Allstate*, 495 F.3d at 163-64. Like the certification requirements themselves, Tex. Util. Code § 37.051(e), the statute's designation requirements are likewise based on incumbency, *id.* § 37.051(g).[4]

---

[4] The DOJ as amicus (at 7) asserts that Texas "is an outlier in preventing designations to out-of-state entities," but, like NextEra's arguments about initial certification, this statement conflates incumbency and residence. And DOJ does not make

In addition, in-state transmission-only companies would face the same hurdles NextEra faces. In-state transmission-only companies may not build transmission in MISO or SPP, just as out-of-state transmission-only companies like NextEra may not. While section 37.154(a) of the Texas Utilities Code provides that rights under a Certificate may be assigned only to entities already certificated in the same power region, there are no already-certificated in-state (*or* out-of-state) transmission-only companies in MISO or SPP, so the treatment of the in- and out-of-state entities remains the same.

NextEra also relies on *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383 (1994), to contend that SB 1938 on its face "unconstitutionally establishes a preference for in-state incumbents against out-of-state businesses." Appellants' Br. 29-31. As an initial matter, *Carbone* says nothing about incumbents generally, and for the reasons already discussed, a distinction on that basis is not the same as an in-state versus out-of-state distinction. Further, *Carbone* is part of a line of "flow control" cases that are distinguishable from the case here. *See LSP Transmission Holdings*, 2020 WL 1443533, at *4 n.5 ("These cases do not involve interests that are comparably similar to the present case."). *Carbone* involved a local flow-control ordinance that required all solid waste leaving the town to be processed at a single designated private facility in the town. 511 U.S. at 386-87. The ordinance's stated purpose was

---

clear how other differences in the details of the law (such as time limitation on incumbents' exercise of their right) are of constitutional significance.

to finance the cost to construct the facility by guaranteeing a certain volume of waste to process. *Id.*

Unlike in *Carbone*, SB 1938 does not favor one local facility to the detriment of all others. *Id.* at 391. It does not on its face prefer either a particular in-state transmission-only company or in-state transmission-only companies generally.[5]

In addition, unlike the flow-control law in *Carbone*, the Texas statute is not a new scheme designed simply to generate revenue for a local business; rather, it codifies a long-standing practice that had successfully fostered system reliability. *See Carbone*, 511 U.S. at 393 (holding that the ordinance's revenue-generating purpose by itself "is not a local interest that can justify discrimination against interstate commerce"). Further, in *Carbone* those financial purposes were unattached to any imposition of responsibilities on the facility—such as those imposed by Texas on vertically-integrated public utilities. The plurality in *United Haulers* distinguished *Carbone* on that basis. 550 U.S. at 342. It explained that "[u]nlike private enterprise, government is vested with the responsibility of protecting the health, safety, and welfare of its citizens." *Id.* While *United Haulers* was specifically concerned with government-owned facilities, the Court found an apt comparison to *Tracy* (decided three years after

---

[5] *Carbone* also considered discriminatory effect, finding that "[t]he ordinance is no less discriminatory because in-state or in-town processors are also covered by the prohibition." *Id.* It was in that effects-context that *Carbone* cited NextEra's other authorities: *Dean Milk Co. v. City of Madison* 340 U.S. 349, 354 (1951) (discussing "practical effect" of law) and *Buck v. Kuykendall*, 267 U.S. 307, 316 (1925) (considering "effect" "upon commerce"). NextEra improperly conflates the facial and effects analyses in its discussion of those cases. *See Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200, 210-11 (2d Cir. 2003).

*Carbone*) and its distinction between private marketers and public utility companies. *Id.* (quoting *Tracy*, 519 U.S. at 313 (Scalia, J., concurring)).

Further, SB 1938 does not involve a burden on the flow of goods in interstate commerce, but rather the building of transmission lines within Texas (an area under PUCT's jurisdiction rather than FERC's, and therefore, by definition not in interstate commerce). To the extent these activities are more aptly characterized as "services" as NextEra (at 32) and DOJ (at 14) both argue, services for the construction and operation of the relevant transmission lines also by necessity is within Texas. *Carbone* involved the use of facilities that *could* have been located out-of-state whereas here the transmission lines *must* be built and operated in Texas itself. *See S. Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 100 (1984) (noting that laws garner more suspicion if business operations could be performed elsewhere).

Accordingly, Texas's right-of-first-refusal statute is not facially discriminatory. The Commissioners note that past versions of the statute—and litigation over the proper statutory interpretation of that prior language—are not relevant to the facial analysis of the current law. Those now-moot debates about the prior law, to which NextEra points (at 52-53), have no bearing on SB 1938's constitutionality. *See Cities of Harlingen*, 311 S.W.3d at 616.

### 3.   The statute was not enacted with a discriminatory purpose.

SB 1938 was not enacted with the purpose to discriminate against interstate commerce. ROA.3032. The Legislature, rather, elected to maintain its "longstanding, successful regulatory approach for selecting the owners and operators of transmission lines." *Cf. LSP Transmission Holdings*, 2020 WL 1443533, at *6.

"'The burden of establishing that a challenged statute has a discriminatory purpose under the Commerce Clause falls on the party challenging the provision.'" *Wal-Mart*, 945 F.3d at 214 (quoting *Allstate*, 495 F.3d at 160). The Court considers:

(1) whether the effect of the state action creates a clear pattern of discrimination;

(2) the historical background of the action, which may include any history of discrimination by the decisionmakers;

(3) the "specific sequence of events leading up" to the challenged state action, including

(4) any "departures from normal procedures[;]" and

(5) "the legislative or administrative history of the state action, including contemporary statements by decisionmakers."

*Id.* (quoting *Allstate*, 495 F.3d at 160). "Legislators' awareness of a discriminatory effect 'is not enough: the law must be passed because of' that discriminatory effect." *Id.* (quoting *Veasey v. Abbott*, 830 F.3d 216, 231 (5th Cir. 2016) (en banc)).

None of the five factors suggests a protectionist legislative purpose in the enactment of SB 1938. Because NextEra's allegations cannot support a finding of discriminatory purpose, it was appropriate for the district court to dismiss this claim on a Rule 12(b)(6) motion. There are no disputed facts material to a finding of discriminatory purpose, as there were in *Wal-Mart*, upon which NextEra relies (at 46-47).

First, the district court correctly found that NextEra has not alleged "a history of hostility toward [NextEra] singularly or towards out-of-state companies in general." ROA.3032-33 (quoting *Allstate*, 495 F.3d at 160). The proper question in the first inquiry is whether the "legislative action affect[s] [Plaintiff] based on its status

as an out-of-state [entity]." *Wal-Mart*, 945 F.3d at 217. As discussed further below, to the extent that Texas's right-of-first-refusal statute has the effect of disadvantaging NextEra, that is only because transmission-only companies are not the favored business form under Texas regulation. *See Allstate*, 495 F.3d at 160-61. "Under the law of the Fifth Circuit, evidence that legislators intended to ban potential permittees based on company form alone is insufficient to meet the purpose element of a dormant Commerce Clause claim." *Wal-Mart*, 945 F.3d at 217; *accord Allstate*, 495 F.3d at 161-62; *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 500-01 (5th Cir. 2001); *see also Exxon*, 437 U.S. at 125.

Second, the historical background does not support a finding of discriminatory purpose. The district court correctly found "no evidence of a sudden or dramatic change in state law, as SB 1938 continues the long-term practice in Texas of allowing existing providers to build needed new transmission lines." ROA.3033. NextEra relies (at 48) on the single exception to that general rule—the unique buildout of extensive wind energy transmission in the Competitive Renewable Energy Zone.[6] Those lines were built in response to the Texas Legislature's extraordinary mandate to promote wind generation, and that buildout has now been completed. In the MISO and SPP areas where NextEra seeks to operate, a transmission-only entity has *never* built a transmission line.

---

[6] "Competitive" refers to fostering the development of wind turbines—an unregulated competitive business—not the construction of transmission lines—a regulated utility business.

Third, NextEra misunderstands the specific events that motivated SB 1938. NextEra contends (at 48) that it was its own attempts to purchase Jacksonville-Overton and its selection by MISO for Hartburg-Sabine that motivated the proposal and passage of SB 1938. The district court correctly held that this characterization was foreclosed by the legislative history. The specific events leading up to SB 1938 were that the Legislature disapproved of the PUCT's 2017 declaratory order and wished to clarify to the PUCT (and the Texas courts, on appeal of that declaratory order) that it had never had the authority to grant a Certificate to a transmission-only entity in the SPP or MISO regions. *See* ROA. 2153. That conclusion does not "run[] headlong into Supreme Court law on determining purpose," as NextEra asserts (at 49). The Court applies a "presumption of legislative good faith." *Wal-Mart*, 945 F.3d at 216 (citing *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018)). Accordingly, a bare assertion that the Legislature's explanation of the need for the bill (to protect the PUCT's rate jurisdiction) was "pretextual" is insufficient to support a claim of discriminatory purpose. ROA.50. Moreover, prior litigation positions taken by the PUCT that differ from the Legislature's stated purpose for the challenged legislation do nothing to establish "pretext[]" on the part of the Legislature. *See* Appellants' Br. 50-51 (citing Resp. Br. of Appellee PUCT at 27, *Entergy Tex.,* No. 03-18-00666-CV).

Fourth, the district court correctly found that SB 1938 "followed a standard path from filing to passage" and that NextEra had not "alleg[ed] any facts indicating that SB 1938 resulted from a legislative process that departed from 'normal procedures.'" ROA.3033 (citing *Allstate*, 495 F.3d at 160-61). NextEra's complaint alleges only that SB 1938 was introduced late in the session, ROA.47, which says nothing

about whether it was "rush[ed]," Appellants' Br. 50. Indeed, it would be an odd result to find that every bill not introduced early in the session fails this factor. Pursuant to usual legislative practice, House and Senate committees heard extensive testimony from a range of interests in favor of and against the bill (including by NextEra). ROA.1899-1901 (witness list); Tex. S. Comm. on Bus. & Commerce, http://tlcsenate.granicus.com/MediaPlayer.php?view_id=45&clip_id=14109 (start 0:00:00) (Senate testimony); Tex. H. Comm. on State Affairs, http://tlchouse.granicus.com/MediaPlayer.php?view_id=44&clip_id=16845 (start 07:47:45) (House testimony).

Fifth, the district court correctly found that the legislative history did not support a finding of discriminatory purpose. ROA.3033. The SB 1938 debate was "devoid of discriminatory remarks directed toward out-of-state competition." *Wal-Mart*, 945 F.3d at 216.

The Bill Analysis for SB 1938 lists four purposes:

- to "codify the existing process in Texas" that the "entity that owns the endpoint of an existing transmission line is the entity that has the right to build any new facility that may be interconnected";

- to "clean-up statutory remnants of the Competitive Energy Zone" buildout and resolve "ambiguity because of statutory exceptions that were included in the Utilities Code to allow outside utilities to construct transmission" as part of that buildout in "areas of West Texas that were not certificated" by the PUCT;

- to "ensure the geographic continuity of the system in a way that further facilitates reliability"; and

- to "ensure[s] that," in the "non-ERCOT areas of the state served by utilities engaged in interstate commerce," the PUCT "maintains its current jurisdiction over transmission rates borne by Texas consumers rather than having a federal rate."

ROA.2153.

NextEra points to the statement by one representative that the bill would ensure "accountable companies with boots on the grounds in our communities" as an "admi[ssion]" that the bill was to "discriminat[e] against out-of-staters." Appellants' Br. 51; ROA.47. Not so. That statement reflects the reality that incumbent providers in a given service area can more quickly remedy outages because they have the needed service centers in the area. *See* ROA.2174. The saved time and cost benefit Texas ratepayers, who have no opportunity to avoid transmission costs. *See* ROA.3071.[7] These considerations are like those the Court encountered in *Wal-Mart*, 945 F.3d at 216. There, the state law at issue banned "public corporation[s]" from obtaining a liquor store permit, which Wal-Mart alleged discriminated against out-of-state entities. The Court found that the legislative purpose was to require owners that were known to the community and could be accountable for responsible

---

[7] Even construing the statement as NextEra does, as a matter of law, "stray protectionist remarks of certain legislators are insufficient to condemn th[e] statute." *Allstate*, 495 F.3d at 161.

operation—a "human" who is easily identifiable and responsible. *Id.* That distinction, the Court held, was "a distinction based not on domicile but on business form." *Id.*

### 4.    The statute is not discriminatory in effect.

Finally, Texas's right-of-first-refusal statute is not discriminatory in effect. Merely because "the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce." *Exxon*, 437 U.S. at 126.

As an initial matter, NextEra did not have the "right" to build Hartburg-Sabine or purchase Jacksonville-Overton even before the enactment of SB 1938. Only the PUCT can confer a Certificate that provides such a right, and NextEra had not received a Certificate for either project. *See Bradley v. Pub. Util. Comm'n*, 289 U.S. 92, 95 (1933) (holding that interstate motor carrier was not "entitled to a certificate as of right"). "Thus it is unclear how the new regulations would affect any shift in the current level of business presently enjoyed by" NextEra. *Allstate*, 495 F.3d at 163 (finding challenged law would not require Allstate to shut any stores).

"[E]ven if we were to assume" an effect on NextEra, the state law "would still not establish a Commerce Clause violation." *See id.* The dormant Commerce Clause does not prevent States from discriminating between different business forms.

In *Exxon*, the Supreme Court held that a burden on some interstate companies is not a violation if "in-state [retailers] will have no competitive advantage over out-of-state [retailers]." 437 U.S. at 126. The dormant Commerce Clause, the Court said, "protects the interstate market, not particular interstate firms." *Id.* at 127-28.

34

That point has been repeatedly affirmed by this Court. In *Wal-Mart*, the Court found no discriminatory effect where the challenged statute's "public corporation ban treats in-state and out-of-state public corporations the same" because "[n]either in-state nor out-of-state public corporations may obtain a [] permit or own a package store." 945 F.3d at 220. In *Ford*, the Court found no discriminatory effect where the statute distinguished between car manufacturers and car dealerships, observing that out-of-state corporations that were non-manufacturers had the same opportunity as in-state corporations to operate in Texas. 264 F.3d at 502. In *Allstate*, the Court found no discriminatory effect because "[n]either in-state nor out-of-state insurers may acquire a body shop." 495 F.3d at 163. And in *Churchill Downs Inc. v. Trout*, there was no discriminatory effect where a law required horse-racing bets to be placed in person because the statute applied irrespective of geography. 589 F. App'x 233 (5th Cir. 2014) (per curiam).

The Second Circuit has elaborated that "even if the Plaintiffs' evidence did demonstrate that it would be 'unworkable' and 'uneconomic' for them to establish brick-and-mortar outlets in New York, that is insufficient to establish a discriminatory effect." *Brown & Williamson*, 320 F.3d at 209-16 ("[E]ven assuming . . . that the only way an out-of-state seller could legally sell retail cigarettes to New York consumers . . . is to establish a brick-and-mortar outlet in New York, the same is true for in-state direct shippers.").

And the Eighth Circuit recently held the same in *LSP Transmission Holdings*, specifically with respect to a right-of-first-refusal provision for building new transmission. 2020 WL 1443533, at *7. It held: "If an entity does not already own an

existing transmission facility in Minnesota, then it—whether a Minnesota or an out-of-state entity—faces the incidental hurdle that is placed by the Minnesota [right-of-first-refusal] provision." *Id.* The State's "preference is for electric transmission owners who have existing facilities, and its law applies evenhandedly to all entities, regardless of whether they are Minnesota-based entities or based elsewhere." *Id.* at *5.

Likewise, here, an in-state transmission-only company has no competitive advantage over an out-of-state transmission-only company. They are all excluded unless they own or buy a utility in Texas. The comparison NextEra draws between itself (a transmission-only company) and the incumbent utilities in the MISO and SPP areas (vertically-integrated utilities) is simply an apples-to-oranges comparison between different business forms. In the MISO and SPP areas, transmission may be built *only* by vertically-integrated utilities (or cooperatives that, along with their constituent members, provide all three phases of electricity generation and sale).

Further, SB 1938 does not preclude out-of-state interests from entering the Texas market for transmission services by buying a Texas utility. As part of a merger or sale of a utility, "the commission may approve a sale, assignment, or lease to an entity that has not been previously certificated if the approval will not diminish the retail rate jurisdiction of this state." Tex. Util. Code §§ 37.154(a), 39.262(l)-(o), 39.915. In purchasing such a utility, the entity would become the favored type of business entity: the endpoint owner of the new transmission. Such a transaction is not merely hypothetical—indeed, the El Paso Electric Company was recently purchased by a New York private equity fund. PUCT, *Joint Report & Application of El*

*Paso Elec. Co. et al.*, Docket No. 49849, *available at* https://inter-change.puc.texas.gov/Documents/49849_280_1050282.PDF (order issued January 28, 2020). That it may be difficult for NextEra, specifically, to take this step means that "particular interstate firms" may face obstacles, but under *Exxon*, that does not satisfy the dormant Commerce Clause, which rather "protects the interstate *market*." 437 U.S. at 127-28.

Finally, *almost all* the incumbents with a right-of-first refusal to build new lines connecting to their own are not controlled by Texas interests, and are appropriately classified as "out-of-state" entities. *See* ROA.1904-2039. Whether the transmission line's parent entity is Florida-based NextEra, the California parent of Oncor, or Louisiana's Entergy, SB 1938 essentially requires that new transmission lines be built, owned, and operated by the entity with the existing infrastructure to maintain that line. In addition to the out-of-state ownership of many of the incumbent utilities, several incumbent utilities also have operations outside of Texas. For example, Southwestern Public Service Company (in SPP) also serves customers in New Mexico; Southwestern Electric Power Company (in SPP) serves Louisiana and Arkansas; and El Paso Electric Company (in the western interconnection region of Texas) also serves New Mexico. *See* ROA.1904-2039.

The fact that many out-of-state entities are favored, and some in-state entities are disfavored, shows that SB 1938's effect is not to discriminate against out-of-state entities. *See LSP Transmission Holdings*, 2020 WL 1443533, at *7; *see also Colon Health Ctrs.*, 813 F.3d at 154 (holding that "incumbency bias" does not by itself show unconstitutional discrimination). *But see Fla. Transp. Servs. v. Miami-Dade County*,

703 F.3d 1230, 1259 (11th Cir. 2012) (cautioning that location of shareholders should not be only factor).

While in some instances, laws that restrain both intrastate and interstate commerce may be deemed facially discriminatory, "[t]his is not such an instance." *LSP Transmission Holdings*, 2020 WL 1443533, at *6. In *Dean Milk v. City of Madison*, the Supreme Court struck down a regulation requiring all milk to be processed at facilities within a certain distance of Madison, which affected both in-state and out-of-state facilities outside that radius. 340 U.S. at 352. But there, the law's practical effect was to exclude milk produced and pasteurized in Illinois—it just also happened to exclude any non-local milk within Wisconsin. The products were the same; the geographic scope was limited. The same was true in *Florida Transportation Services*, 703 F.3d at 1259, upon which NextEra relies (at 44), in which virtually identical stevedore companies were being distinguished by the state law. Not so here, for the reasons already described. "We cannot . . . accept appellants' underlying notion that the Commerce Clause protects the particular structure or methods of operation in a . . . market." *Exxon*, 437 U.S. at 127. That is particularly so given the "longstanding state authority" over "siting, permitting, and construction" of transmission. Order 1000, at 33, ¶ 107; *see also LSP Transmission Holdings*, 2020 WL 1443533, at *6.

## B.  Texas's right-of-first-refusal law survives scrutiny.

After determining whether the Texas law is discriminatory, the Court applies the appropriate level of scrutiny. SB 1938 passes either test.

### 1. Texas's nondiscriminatory law survives *Pike* scrutiny.

Because Texas's right-of-first-refusal law does not discriminate against inter-state commerce, the applicable test is whether the law is "clearly excessive" relative to the "putative local benefits." *Pike*, 397 U.S. at 142; *United Haulers*, 550 U.S. at 346. It is not. *See* ROA.3033; *LSP Transmission Holdings*, 2020 WL 1443533, at *8 (finding Minnesota right-of-first-refusal law passes the *Pike* test).

Courts routinely dismiss *Pike* claims once they have found no discrimination. *See, e.g.*, *Elec. Power Supply Ass'n v. Star*, 904 F.3d 518, 524-25 (7th Cir. 2018); *Allco*, 861 F.3d at 103-08. In *Tracy*, the Supreme Court held that laws are invalidated under *Pike* only where they "undermin[e] a compelling need for national uniformity in regulation." 519 U.S. at 298 n.12 ("The fact that Ohio exempts local utilities from its sales and use taxes could not support any claim of undue burden in this nondiscriminatory sense, since the exemption itself does not give rise to conflicting regulation of any transaction or result in malapportionment of any tax."). If the State law is not inconsistent with federal goals, it will pass the *Pike* test if it was enacted in a "legitimate state pursuit." *Allco*, 861 F.3d at 108. Texas's right-of-first-refusal law does not conflict with a need for national uniformity; indeed, FERC has expressly permitted the inclusion of state right-of-first-refusal requirements in ISO tariffs.

The State interest in utility regulation "is one of the most important of the functions traditionally associated with the police power of the States." *New Orleans Pub. Serv.*, 491 U.S. at 365. In the utility context, state legislatures are uniquely positioned to find facts and make determinations, and adopt the best regulatory measures, regarding the "health, life and safety" of their citizens. *Tracy*, 519 U.S. at 306.

None of NextEra's authorities presents a state interest comparable to the interest in regulating utilities. Texas's right-of-first-refusal law preserves the historically-proven status quo for transmission construction. *See LSP Transmission Holdings*, 2020 WL 1443533. That goal is within the State's legitimate interest in regulating the intrastate transmission of electric energy. *See* 16 U.S.C. § 824(b)(1). And "the states retain authority over the location and construction of electrical transmission lines." *Ill. Commerce Comm'n v. FERC*, 721 F.3d 764, 773 (7th Cir. 2013).

Furthermore, while NextEra argues (at 56-57) that Texas's policy choice would hurt, rather than help, the electric system in the State, that is Texas's policy determination to make. The Court does not "second-guess the empirical judgments of lawmakers concerning the utility of legislation." *Allstate,* 495 F.3d at 164 (quoting *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 92 (1987)). Rather, it is credited "so long as an examination of the evidence before or available to the lawmaker indicates that the regulation is not wholly irrational in light of its purposes." *Id.* (quoting *Ford,* 264 F.3d at 504).

On the other side of the scale, NextEra has failed to adequately plead a burden on the interstate market, as opposed to merely on itself. The burden must be on the interstate market, not particular interstate firms. *Exxon*, 437 U.S. at 127-28; *see also Wal-Mart*, 945 F.3d at 223. Additionally, "[a] statute imposes a burden when it inhibits the flow of goods interstate," *Allstate,* 495 F.3d at 163 (citing *Ford*, 264 F.3d at 503), but the Texas statute concerns the intrastate siting of transmission lines.

And while NextEra claims an aggregate burden from numerous states' right-of-first-refusal statutes, which it says would operate to nullify FERC's removal of the

federal right, it bears repeating that FERC's Order 1000 did not displace state au-

thority. *See LSP Transmission Holdings*, 2020 WL 1443533, at \*8; *see also MISO*

*Transmission Owners*, 819 F.3d at 335-36. Moreover, the right-of-first-refusal has not

even been eliminated at the federal level for baseline reliability projects (as opposed

to cost allocation projects), *see MISO Transmission Owners*, 819 F.3d at 335-36, so it

cannot be said that Order 1000 would be nullified by the continued operation of some

rights of first refusal.

Accordingly, the district court appropriately dismissed the *Pike* claim. Remand

is unnecessary (contrary to NextEra's assertion at 55), because as a matter of law

there is no burden on interstate commerce and, accordingly, NextEra could not show

any facts that would render the law "clearly excessive" in comparison.

## 2. Texas's law would even survive virtually *per se* scrutiny.

While laws found to discriminate against interstate commerce are "virtually *per*

*se*" invalid, that rule is not absolute; the law will stand if the State can "show that it

advances a legitimate local purpose that cannot be adequately served by reasonable

nondiscriminatory alternatives." *Or. Waste Sys.,* 511 U.S. at 100-01 (quoting *New*

*Energy Co. v. Limbach*, 486 U.S. 269, 278 (1988)). This has happened before: in

*Maine v. Taylor*, the Supreme Court held that a bar on the import of certain minnows

was the only way for Maine to protect its natural environment from the hazard of

parasites and non-native species being introduced into the State's waters. 477 U.S.

131, 141 (1986).

Moreover, in *Camps Newfound*, four Supreme Court justices would have found

that the law there survived this level of scrutiny—and even went further to read

*Tracy* as creating a complete exception from the dormant Commerce Clause for public utilities. 520 U.S. at 607 (Scalia, J., dissenting). The dissent would have found that while the law constituted facial discrimination, it "is supported by such traditional and important state interests that it survives scrutiny under the 'virtually per se rule of invalidity,'" as with public utilities. *Id.* at 608. The majority pointed out that no party in that case had tried to argue that they survived *per se* scrutiny, and that it was therefore inappropriate to consider that argument. *Id.* at 582 n.16 (majority op.) (noting also that the State had "ample alternatives" to "achieve its apparent goal of subsidizing the attendance of the State's children at summer camp.").

Even if the Court were to find the Texas right-of-first-refusal statute discriminatory—which it should not—it is "demonstrably justified by a valid factor unrelated to economic protectionism." *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992). Whether public utilities receive an across-the-board exception or simply involve incredibly strong and long-standing state interests in promoting system reliability and protecting ratepayers, SB 1938 would survive even strict scrutiny.

## II. NextEra Fails to State a Claim Under the Contracts Clause.

The Contracts Clause prohibits States from passing any law that "impair[s] the Obligations of Contracts." U.S. Const. art. I, § 10, cl. 1. The Court uses a three-part test to determine if a State law violates the Contracts Clause. *Powers v. United States*, 783 F.3d 570, 577-78 (5th Cir. 2015). "First, the threshold inquiry is whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Id.* at 578 (quoting *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411 (1983)). Second, if it does, the State must articulate "a significant and

legitimate public purpose behind the regulation" *Id.* (quoting *Energy Reserves Grp.*, 459 U.S. at 411-12). Third, if there is a legitimate public purpose, the Court asks whether the change to the rights and responsibilities of the contracting parties was reasonable and appropriate in light of that public purpose. *Id.*

NextEra asserts that SB 1938 substantially impairs both the Hartburg-Sabine and Jacksonville-Overton contracts. ROA.58. NextEra also asserts that SB 1938 does not "advance any goals that are important and of legitimate public concern" and that, even if it does, the changes to its contractual expectations "are neither reasonable nor necessary" to serve that public concern. ROA.58. The district court correctly held that NextEra failed to state a claim under the Contracts Clause.

## A. SB 1938 did not substantially impair a contractual relationship.

As the district court correctly held, SB 1938 does not operate as a substantial impairment of a contractual relationship. ROA.3035. Because the relevant contracts were expressly conditioned on PUCT approval—which was not a given even before the passage of SB 1938—NextEra Midwest had only an expectation, not a right, under contract. Accordingly, the contracts at issue do not supply a vested right that would subject the contract to Contracts Clause analysis. *See Dodge v. Bd. of Educ.*, 302 U.S. 74, 77-78 (1937). Notably, while NextEra's complaint asserts "contractual right[s] to "build and operate" Hartburg-Sabine and "buy" Jacksonville-Overton, ROA.58, its factual descriptions of the contracts tells a different story: As to Hartburg-Sabine, the "Selected Developer Agreement" did not give the company the right to *build* the line—only the right to recover its costs (subject to FERC review) and a reasonable return on its investment (subject to certain cost caps). *See* ROA.53.

And the Agreement acknowledges that NextEra was required to obtain a Certificate for the line from the PUCT. ROA.53. As to Jacksonville-Overton, the complaint acknowledges that it cannot "clos[e] its currently pending transaction to acquire" the line without PUCT approval. ROA.54-55.

On appeal, NextEra argues somewhat differently (at 60) that "the PUCT's then-existing certification criteria" *themselves* constitute "the specific contractual right" the new law impairs—but PUCT criteria are not private contract terms and do not, accordingly, form the basis for a Contracts Clause claim. *See Gen. Motors Corp. v. Romein*, 503 U.S. 181, 189 (1992) ("[W]e not held that all state regulations are implied terms of every contract entered into while they are effective.")

NextEra entered its agreements with knowledge that, at best, Texas did not clearly permit non-incumbent transmission providers—particularly outside of ER-COT. No transmission line has ever been built outside ERCOT by a transmission-only utility. With respect to Jacksonville-Overton, NextEra executed its purchase agreement on June 7, 2017, which was after certain parties had (on February 28, 2017) asked the PUCT for a declaratory order regarding whether transmission-only utilities were permitted in SPP, but *before* the PUCT issued its declaratory order on October 26, 2017. *See* PUCT, *J. Pet. of Sw. Pub. Serv. Co.*, 2017 WL 5068379, at *1 & n.1. And regarding Hartburg-Sabine, NextEra entered into the Selected Developer Agreement on January 25, 2019, while that issue was being briefed before the Texas Third Court of Appeals. *See Entergy Tex.,* No. 03-18-00666-CV.

An "important consideration in [the] substantial impairment analysis is the extent to which the law upsets the reasonable expectation the parties had at the time of

contracting, regarding the specific contractual rights the state's action allegedly impairs." *United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 627 (5th Cir. 2010). "Courts look to terms of the contract to determine the parties' reasonable expectations, including whether the risk of a change in the law was contemplated at the time of contracting." *Id.* at 628 (citing *Energy Reserves Grp.*, 459 U.S. at 414-16).

In *Energy Reserves Group*, the Supreme Court rejected a Contracts Clause claim brought by a natural gas company alleging impairment of its contract rights by a Kansas act regulating natural gas prices. 459 U.S. at 418-19. The Court relied on the fact that Kansas's supervision of the natural gas industry was "extensive and intrusive" and that the State was exercising its police powers. *Id.* at 413-17. Even though Kansas had never previously regulated natural gas prices, the Court pointed to terms in the contract that adjusted for changes in gas-price regulation as demonstrating that the parties must have known that their "contractual rights were subject to alteration by state price regulation." *Id.* at 415-16.

Here, Texas's regulation of the electric transmission business is both "extensive and intrusive." Indeed, every aspect of the production, transmission, distribution, and retail sale of electricity is regulated and supervised by the State in some fashion. *See* Tex. Util. Code §§ 31.001-43.152; 16 Tex. Admin. Code ch. 25. NextEra could have no reasonable expectation of being able to build or own the lines in question, and further should have reasonably expected that the Texas Legislature might act to resolve any issue. *See Veix v. Sixth Ward Bldg. & Loan Ass'n*, 310 U.S. 32, 38 (1940) (taking into account that the petitioner had "purchased into an enterprise already regulated in the particular to which he now objects").

Courts have repeatedly held that when a State is not a party to the contract, a legislative change in a heavily-regulated industry does not disrupt a party's reasonable expectations or extensively impair the contract. *See United Healthcare,* 602 F.3d at 627; *see also Alliance of Auto. Mfrs., Inc. v. Currey,* 984 F. Supp. 2d 32, 54 (D. Conn. 2013), *aff'd,* 610 F. App'x 10 (2d Cir. 2015) (car manufacturing and dealing); *Am. Express Travel Related Servs., Inc. v. Sidamon-Eristoff,* 669 F.3d 359, 370 (3d Cir. 2012); *Hawkeye Commodity Promotions, Inc. v. Vilsack,* 486 F.3d 430, 437-38 (8th Cir. 2007) (gambling industry).

NextEra attempts to circumvent the "reasonable" expectations analysis with a conclusory statement that it would not have entered into the contract with MISO if it were not reasonable to do so. Appellants' Br. 60 (stating that it "would have made no sense for MISO or NextEra to have gone through the time, expense, and effort of a competitive bidding process involving non-incumbents if a law such as SB 1938 was contemplated."). But if entering a contract necessarily showed an expectation of no further legislation in that area, courts would never need to consider a party's reasonable expectations.

In sum, NextEra is wrong that "SB 1938 wholly 'upset' NextEra's reasonable contractual expectation that it would be able—under the PUCT's then-existing certification criteria—to apply for and obtain a CCN from the PUCT so that it could construct the new transmission line." Appellants' Br. 60 (emphasis omitted).

## B.  SB 1938 furthers a significant and legitimate public purpose.

Even if SB 1938 impaired NextEra's contractual interests, the district court properly found it "rests on, and is prompted by, significant and legitimate state

interests." ROA.3035 (citing *Energy Reserves Grp.*, 459 U.S. at 416-17). The Supreme Court has held that "[o]ne whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them. The contract will carry with it the infirmity of the subject-matter." *Hudson Cty. Water Co. v. McCarter*, 209 U.S. 349, 357 (1908).

> It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power, which, in its various ramifications, is known as the police power, is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals.

*Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 241 (1978) (quoting *Manigault v. Springs*, 199 U.S. 473, 480 (1905)).

As already discussed extensively, SB 1938 rests on the State's traditional authority to regulate utilities and, specifically, the building and siting of transmission in the State. The district court had likewise extensively discussed the legitimate and substantial state interests undergirding SB 1938 earlier in its opinions; thus, NextEra's criticism (at 64) that the district court had devoted only one sentence to this factor is unwarranted.

## C. SB 1938 does not unreasonably adjust a contract in light of its significant and legitimate public purpose.

As with *Pike* balancing in the dormant Commerce Clause context, NextEra contends (at 55) that this prong represents a factual question inappropriate for

consideration at the motion to dismiss stage. But, as there, because NextEra has not adequately pleaded the burden side of the equation—here, a substantial impairment of contract—it fails this balancing test as a matter of law.

## III. NextEra Is Not Entitled to a Preliminary Injunction.

Having granted the motion to dismiss, the district court correctly dismissed NextEra's motion for preliminary injunction. ROA.3035. If this Court reverses, the correct course would be to remand the motion for preliminary injunction for consideration by the district court in the first instance.

In any event, NextEra cannot satisfy the criteria for a preliminary injunction: "(1) a substantial likelihood of success on the merits; (2) a substantial threat that plaintiffs will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest." *Planned Parenthood of Hous. & Se. Tex. v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005).

The Commissioners have demonstrated, *supra*, that NextEra lacks a high likelihood of success on the merits. While NextEra points to the virtually *per se* invalidation of discriminatory statutes, it is unlikely to show that the statute is discriminatory. Even if the Court were to reverse the grant of the motion to dismiss, that is not equivalent to a finding of a strong likelihood of success on the merits. The Eighth Circuit's recent decision dismissing a dormant Commerce Clause challenge to a substantively identical law further undermines the chance of success on the merits. *LSP Transmission Holdings*, 2020 WL 1443533, at *1.

As to irreparable injury, NextEra presumes, incorrectly, that it has a currently-existing "right" to the two transmission lines at issue. It does not. PUCT has not approved those projects and it is far from clear that they would be approved even in the absence of SB 1938. Indeed, in a filing at FERC in January 2019, before SB 1938 had been proposed, NextEra detailed the difficulty it would face attempting to obtain a Certificate for Hartburg-Sabine and acknowledged this as a risk to the project's future. *See* ROA.2157-71 (NextEra Abandoned Plant Incentive Application 8-9 (Jan. 4, 2019)); *see also* Tex. Util. Code § 37.056 (factors PUCT considers). And while NextEra asserts that it would have no remedy for the loss of expected profits, its contract builds in the risk that PUCT and other approvals might not be granted: NextEra can recover its prudently-incurred project costs if the contract is terminated. *See NextEra Energy Transmission Midwest, LLC,* Order Granting Abandoned Plant Incentive, 166 FERC ¶ 61,169 (Mar. 5, 2019). In any event, irreparable injury is not established by monetary damages alone. *DFW Metro Line Servs. v. Sw. Bell Tel. Co.*, 901 F.2d 1267, 1269 (5th Cir. 1990).

In contrast, the injury to Texas from the injunction NextEra seeks would be extensive. NextEra's original request for a full preliminary injunction of SB 1938 is massively overbroad, as it would effectively halt the process for certifying new electric-transmission facilities in Texas, including in the intrastate ERCOT region. And if the injunction were narrowed (as NextEra asks this Court to instruct at 66-67) with an eye toward "protect[ing]" NextEra's projects, it appears that the injunction sought would have to somehow compel PUCT approval of the projects. Otherwise, it is unclear how NextEra's projects could be temporarily "protected" simply by

preliminarily enjoining SB 1938, since PUCT would retain the discretion to deny a Certificate for the projects. And the requested injunction would harm Texas's sovereignty. *See Ark. Elec. Coop.*, 461 U.S. at 377.

The public interest further favors denying the preliminary injunction request. Granting NextEra's requested injunction would risk regulatory uncertainty and potential increased costs for Texas ratepayers. Even a narrowly-tailored injunction could interfere with the ability to plan and coordinate new transmission projects that are required by Texas's rapid population growth. *See* ROA.2057-68.

## CONCLUSION

The Court should affirm the dismissal of NextEra's complaint.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant
  Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

KYLE D. HAWKINS
Solicitor General

/s/ Lisa A. Bennett
LISA A. BENNETT
Assistant Solicitor General
Lisa.Bennett@oag.texas.gov

Counsel for Appellees

## CERTIFICATE OF SERVICE

On April 22, 2020, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Lisa A. Bennett
LISA A. BENNETT

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,999 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Lisa A. Bennett
LISA A. BENNETT