NO. 20-50160

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

NEXTERA ENERGY CAPITAL HOLDINGS, INCORPORATED;
NEXTERA ENERGY TRANSMISSION, L.L.C.; NEXTERA ENERGY
TRANSMISSION MIDWEST, L.L.C.; LONE STAR
TRANSMISSION, L.L.C.; NEXTERA ENERGY TRANSMISSION
SOUTHWEST, L.L.C.,

Plaintiffs-Appellants,

v.

COMMISSIONER ARTHUR C. D'ANDREA, Public Utility
Commission of Texas, in his official capacity; COMMISSIONER
SHELLY BOTKIN, Public Utility Commission of Texas, in her official
capacity; and CHAIRMAN DEANN T. WALKER, Public Utility
Commission of Texas, in her official capacity,

Defendants-Appellees.

On Appeal from the United States District Court
for the Western District of Texas, Civil No. 1:19-cv-00626-LY

---

## Appellants' Reply Brief

---

STUART H. SINGER
PASCUAL OLIU
EVAN EZRAY
Boies Schiller Flexner LLP
401 East Las Olas Boulevard
Fort Lauderdale, FL  33301
Telephone: (954) 356-0011
Facsimile:  (954) 356-0022

JEFFREY M. TILLOTSON
Tillotson Law
1807 Ross Ave., Suite 325
Dallas, Texas 75201
Telephone: (214) 382-3040
Facsimile:  (214) 292-6564
jtillotson@tillotsonlaw.com

## **CERTIFICATE OF INTERESTED PERSONS**

NEXTERA ENERGY CAPITAL HOLDINGS, INCORPORATED,
NEXTERA ENERGY TRANSMISSION, L.L.C., NEXTERA ENERGY
TRANSMISSION MIDWEST, L.L.C., LONE STAR
TRANSMISSION, L.L.C., and NEXTERA ENERGY
TRANSMISSION SOUTHWEST, L.L.C.,

Plaintiffs-Appellants

v.

COMMISSIONER ARTHUR C. D'ANDREA, Public Utility
Commission of Texas, in his official capacity, COMMISSIONER
SHELLY BOTKIN, Public Utility Commission of Texas, in her official
capacity, and CHAIRMAN DEANN T. WALKER, Public Utility
Commission of Texas, in her official capacity,

Defendants-Appellees

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. Plaintiffs-Appellants:

> NextEra Energy Capital Holdings, Inc., NextEra Energy Transmission, LLC, NextEra Energy Transmission Midwest, LLC, Lone Star Transmission, LLC, and NextEra Energy Transmission Southwest, LLC, all of which are direct or indirect subsidiaries of NextEra Energy, Inc., which is a publicly held

corporation with no parent company, and no entity owns 10% or more of its stock.

2. Counsel for Plaintiffs-Appellants:

> Boies Schiller Flexner LLP
> Stuart H. Singer
> Carlos M. Sires
> Evan Ezray
> Pascual A. Oliu
> Tillotson Law
> Jeffrey M. Tillotson

3. Defendants-Appellees:

> Deann T. Walker (Chairman, Public Utility Commission of Texas), Arthur C. D'Andrea (Commissioner, Public Utility Commission of Texas), and Shelly Botkin (Commissioner, Public Utility Commission of Texas), each in his or her official capacity.

4. Counsel for Defendants – Appellees:

> Office of the Attorney General of Texas
> John R. Hulme
> H. Carl Myers
> Jessica Elizabeth Soos

5. Third-Parties That Attempted to Intervene, and their Counsel:

> Entergy Texas, Inc., represented by: Eversheds Sutherland (US) LLP, Catherine Elise Garza, Lino Mendiola III, Michael A. Boldt, Entergy Services, LLC, George Hoyt, Miguel Suazo, Wajiha Rizvi.

> East Texas Electric Cooperative, Inc., represented by: Holland & Knight LLP, L. Bradley Hancock, Mark C. Davis, Theresa Wanat, Jacob Lawler.

Oncor Electric Delivery Company LLC, represented by: Vinson & Elkins, L.L.P., John C. Wander, Kevin W. Brooks, Thomas S. Leatherbury, Winston Patrick Michael Skinner.

LSP Transmission Holdings II, LLC., represented by: Kirkland & Ellis LLP, Erin E. Murphy, Paul D. Clement, Kenneth A. Young, Anna Rotman, Tabitha J. De Paulo.

Southwestern Public Service Company, represented by: Jenner & Block LLP, Jason Perkins, Mark A. Walker, Matthew E. Price, Max Minzner, Ron H. Moss, Tassity Johnson.

Texas Industrial Energy Consumers, represented by: Thompson & Knight LLP, Katherine L. Coleman, Michael McMillin.

6. Attorneys for the United States, which submitted a statement of interest:

Matthew C. Mandelberg
Makan Delrahim
Michael F. Murray
Daniel E. Haar

By: */s/ Jeffrey Mark Tillotson*
Jeffrey Mark Tillotson
Attorney of record for Appellants

# TABLE OF CONTENTS

Certificate of Interested Persons ................................................. i

Table of Contents................................................................. iv

Table of Authorities .......................................................... vii

Argument ........................................................................ 1

    I.    SB 1938 discriminates against interstate commerce on its face, in its effects, and in its purpose................................ 3

        A.    On its face, SB 1938 discriminates against out-of-state utilities. ............................................................. 3

            1.    SB 1938's facial discrimination cannot be defended as a preference only for vertically integrated utilities................................ 4

            2.    SB 1938's facial discrimination cannot be excused as a business form or incumbency preference............................................... 6

            3.    SB 1938's facial discrimination cannot be defended in light of *Tennessee Wine*, *Carbone*, and other Supreme Court Commerce Clause precedents. .............................. 8

            4.    SB 1938's discrimination is especially indefensible in light of its impact on interstate transmission projects. ....................... 12

        B.    Unlike the retail law in *Tracy*, SB 1938 distinguishes among similarly-situated entities providing exactly the same service in wholesale markets. ........................................................ 13

1. *Tracy* does not endorse a "Public Utilities" exception to the Commerce Clause. .................... 13

2. *Tracy*'s approval of preferential tax treatment for regulated retail sales does not insulate an outright prohibition on out-of-state competitors for non-retail transmission business. ........................................ 14

3. Transmission-only companies and vertically integrated utilities are similarly situated in the only market where they compete. ................ 15

C. Neither FERC nor Congress has approved of laws like SB 1938. ................................................ 17

D. SB 1938 has the effect of discriminating against out-of-state utilities. ...................................... 19

E. SB 1938 was enacted with a discriminatory purpose. ........................................................ 21

F. SB 1938 did not codify existing law ............................ 25

II. SB 1938 fails under *Pike*. ...................................... 27

III. SB 1938 violates the Contracts Clause. ............................... 29

A. SB 1938 substantially impaired Nextera's contracts. .................................................... 29

B. Defenses for impairment are not properly resolved on a motion to dismiss. ................................. 32

IV. NextEra is entitled to a preliminary injunction. .................. 33

Conclusion ............................................................. 35

v

Certificate of Service ..................................................................... 36

Certificate of Compliance ............................................................ 37

Certificate Regarding Electronic Submission ......................................... 38

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Air Evac EMS, Inc. v. Cheatham*,
260 F. Supp. 3d 628 (S.D. W. Va. 2017) ............................................... 33

*Alliance of Auto. Mfrs., Inc. v. Currey*,
984 F.Supp.2d 32 (D. Conn. 2013) ....................................................... 31

*Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*,
669 F.3d 359 (3d Cir. 2012).................................................................. 31

*Barrett v. City of N.Y.*,
232 U.S. 14 (1914) .................................................................................. 9

*C & A Carbone, Inc. v. Town of Clarkstown*,
511 U.S. 383 (1994) ....................................................................... *passim*

*Causey v. Sewell Cadillac-Chevrolet, Inc.*,
394 F.3d 285 (5th Cir. 2004) ............................................................... 21

*Colon Health Centers of Am., LLC v. Hazel*,
813 F.3d 145 (4th Cir. 2016) ................................................................. 8

*Cooper v. McBeath*,
11 F.3d 547 (5th Cir. 1994) ................................................................. 22

*Dean Milk Co. v. City of Madison*,
340 U.S. 349 (1951) ....................................................................... *passim*

*Dep't of Revenue v. Davis*,
553 U.S. 328 (2008) .............................................................................. 11

*Dodge v. Board of Education of Chicago*,
302 U.S. 74 (1937) ............................................................................... 29

*E & E Hauling, Inc. v. Forest Pres. Dist.*,
  613 F.2d 675 (7th Cir. 1980) .................................................. 32

*Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*,
  459 U.S. 400 (1983) ...................................................... *passim*

*Fla. Transp. Servs., Inc. v. Miami-Dade Cnty*,
  703 F.3d 1230 (11th Cir. 2012) ......................................... 19

*General Motors Corp. v. Romein*,
  503 U.S. 181 (1992) ........................................................ 29

*General Motors Corp. v. Tracy*,
  519 U.S. 278 (1997) ...................................................... *passim*

*Granholm v. Heald*,
  544 U.S. 460 (2005) ...................................................... *passim*

*Hawkeye Commodity Promotions, Inc. v. Vilsack*,
  486 F.3d 430 (8th Cir. 2007) ............................................ 31

*Kuritz v. New York*,
  2012 WL 6020039 (N.D.NY. Dec. 3, 2012) .......................... 33

*Lewis v. BT Inv. Managers, Inc.*,
  447 U.S. 27 (1980) .................................................. 6, 7, 22

*LSP Transmission Holdings, LLC v. Sieben*,
  954 F.3d 1018 (8th Cir. 2020) ....................................... *passim*

*N.C. State Conference of NAACP v. McCrory*,
  831 F.3d 204 (4th Cir. 2016) ............................................ 22

*New England Power Co. v. New Hampshire*,
  455 U.S. 331 (1982) .................................................. 13, 18

*Or. Waste Sys., Inc. v. Dep't of Envt'l Quality*,
  511 U.S. 93 (1994) .......................................................... 33

*Pike v. Bruce Church, Inc.,*
  397 U.S. 137 (1970) ....................................................................... 27, 28

*PUCT v. Cities of Harlingen,*
  311 S.W.3d 610 (Tex. App. – Austin, 2010, no pet.) ...................... 16, 25

*Rogers v. Lodge,*
  458 U.S. 613 (1982) ............................................................................. 23

*S.-Cent. Timber Dev., Inc. v. Wunnicke,*
  467 U.S. 82 (1984) ............................................................................... 19

*S. Dakota Farm Bureau, Inc. v. Hazeltine,*
  340 F.3d 583 (8th Cir. 2003) .............................................................. 22

*Serv. Mach. & Shipbuilding Corp. v. Edwards,*
  617 F.2d 70 (5th Cir. 1980) ................................................................ 28

*Six Kingdoms Enterprises, LLC v. City of El Paso,*
  2011 WL 65864 (W.D. Tex. Jan. 10, 2011) ..................................... 30, 31

*Tennessee Wine & Spirits Retailers Ass'n v. Thomas,*
  139 S. Ct. 2449 (2019) ................................................................. *passim*

*Texas v. U.S. EPA,*
  829 F.3d 405 (5th Cir. 2016) .............................................................. 34

*U.S. Trust Co. of N.Y. v. New Jersey,*
  431 U.S. 1 (1977) ........................................................................... 29, 32

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.,*
  550 U.S. 330 (2007) ....................................................................... 10, 11

*United Healthcare Ins. Co. v. Davis,*
  602 F.3d 618 (5th Cir. 2010) ...................................................... 30, 31, 32

*United Transp. Union v. Foster,*
  205 F.3d 851 (5th Cir. 2000) .............................................................. 27

ix

*Veasey v. Abbott,*
  830 F.3d 216 (5th Cir 2016) ...................................................... 21, 22, 24

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
  429 U.S. 252 (1977) ................................................................ 24

*Walgreen Co. v. Rullan,*
  405 F.3d 50 (1st Cir. 2005) ........................................................ 19

*Wal-Mart Stores Inc. v. Tex. Alcoholic Bev. Comm'n,*
  945 F.3d 206 (5th Cir. 2019) .................................................. 21, 25

*Wyoming v. Oklahoma,*
  502 U.S. 437 (1992) .......................................................... 13, 18

## Statutes

16 U.S.C. § 824p ..................................................................... 18

Public Utility Regulatory Act,
  Tex. Util. Code § 31.002(6) ..................................................... 16

Tex. Health & Safety Code 361.001 ............................................. 10

Tex. Util. Code § 35.005 ........................................................... 16

Tex. Util. Code § 35.005(b) ....................................................... 17

Tex. Util. Code § 38.001 ........................................................... 16

Texas SB 1938 ............................................................... passim

## Rules

Fed. R. App. P. 32(a)(5) ............................................................ 37

Fed. R. App. P. 32(a)(6) ............................................................ 37

Fed. R. App. P. 32(a)(7) ............................................................ 37

Fed. R. App. P. 32(f) ............................................................... 37

## Other Authorities

Charles Alan Wright & Arthur Miller,
    5B Fed. Prac. & Proc. § 1357 (3d ed.) .................................................... 24

*Joint Petition of Sw. Pub. Serv. Co. & Sw. Power Pool, Inc. for
    Declaratory Order*,
    2017 WL 5068379 (Oct. 26, 2017) .................................................. 25, 26

Midwest Indep. Transmission Sys. Operator, Inc.,
    150 FERC ¶ 61037 (F.E.R.C. Jan. 22, 2015) ........................................ 18

## **ARGUMENT**

SB 1938 grants in-state incumbents the exclusive right to build, own and operate *interstate* transmission lines. These lines, as relevant to this case, are commissioned by *interstate* grid operators, to provide *interstate* transmission services, and their costs will be shared by an *interstate* group of utilities throughout the affected *interstate* region. Texas may unquestionably exercise its police power to issue permits, but it may not exclude out-of-state firms from competing to provide these interstate transmission services—just as Tennessee can exercise its police power over permits for retail licenses to sell wine within its borders, but cannot discriminate against out-of-state competitors in favor of in-state retailers through a residency requirement. *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2462 (2019).

Texas and its *amici* do not defend the District Court's view that dormant commerce clause jurisprudence is limited to laws that burden the flow of goods, as opposed to services such as building, owning, and operating interstate transmission facilities. Neither does Texas or its *amici* defend SB 1938 as written; instead, they defend an imaginary law that distinguishes between vertically integrated utilities and other

1

utilities—but that is not what SB 1938 says or does. The statute favors entities with an "existing facility" in Texas, regardless of whether that utility is vertically integrated.

However, SB 1938 would violate the Commerce Clause even if it drew the distinction that Texas and its *amici* posit, because the disfavored entities are similarly situated to favored entities: they provide identical transmission services, subject to identical obligations, and under oversight by the state Public Utility Commission ("PUCT"), and the federally-created Independent System Operators ("ISO"). Accordingly, *Tracy* is inapposite. Texas's suggestion that *Tracy* creates a freestanding "public utilities exception" to the Commerce Clause is contrary to *Tracy* itself, not to mention decades of Supreme Court cases applying the Commerce Clause to regulations of utilities. If accepted, moreover, Texas's view would allow Texas to grant utilities a monopoly in any number of markets beyond retail power distribution. Because SB 1938 discriminates on its face, in its effects, and in its purpose, the law is subject to virtual *per se* invalidity that can only be sustained by a showing that discrimination is the only way Texas can advance legitimate state interests.

Independently, SB 1938 abrogates NextEra's contracts to build the Hartburg-Sabine line and to acquire the Jacksonville-Overton line. Before SB 1938, the PUCT and state courts held that transmission-only utilities had the right to build new transmission lines. When NextEra secured the Hartburg-Sabine contract, however, Texas passed SB 1938 to reverse the PUCT and state court decisions and preclude NextEra from moving forward—exactly the sort of retroactive abrogation of contract that the Constitution prohibits.

Accordingly, the decision below must be reversed.

## I.    SB 1938 DISCRIMINATES AGAINST INTERSTATE COMMERCE ON ITS FACE, IN ITS EFFECTS, AND IN ITS PURPOSE.

### A.    ON ITS FACE, SB 1938 DISCRIMINATES AGAINST OUT-OF-STATE UTILITIES.

The plain text of SB 1938 allows the PUCT to grant a certificate for building transmission lines *only* to utilities with an "existing facility" in Texas. SB 1938 § 4. This is, on its face, a residency or presence requirement, and it is indistinguishable from local-presence requirements that have recently and long been struck down by the Supreme Court under the Commerce Clause. *Tenn. Wine*, 139 S. Ct. at

2462; *Granholm v. Heald*, 544 U.S. 460, 475 (2005); *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354 (1951).[1]

> **1.    SB 1938's facial discrimination cannot be defended as a preference only for vertically integrated utilities.**

Texas defends SB 1938 as though it enacted a preference only for vertically integrated utilities, but that distinction is not found in the text of the statute. In fact, rather than ensuring that vertically integrated utilities construct the transmission lines that will connect to their facilities, SB 1938 allows utilities to transfer their right to build connecting transmission lines to another utility—but only if that other

---

[1] LCRA and Oncor confuse the concept of "facial discrimination," which asks whether a law discriminates facially against out-of-state entities, with "facial challenges," under which plaintiffs need not show that a law has been applied against them if they can show that the law is invalid in all applications. Here, NextEra has pleaded that the law directly impacts two of its projects in Texas, and that the law discriminates on its face against out-of-state companies. There is no merit to the suggestion by LCRA and Oncor that Texas can facially discriminate against out-of-state entities in interstate markets as long as it also discriminates in purely intrastate markets. *Dean Milk*, 340 U.S. at 354 n.4 ("It is immaterial that Wisconsin milk from outside the Madison area is subjected to the same proscription as that moving in interstate commerce.").

4

utility is already certified in the area. SB 1938 § 4(g). In other words, SB 1938 does not ensure that the utility distributing power in an area will be the one building transmission lines in that area; it ensures that *only in-state incumbents* can build transmission lines.

Texas admits SB 1938 favors in-state incumbents that lack retail responsibilities, although it claims that these entities are either within ERCOT or part of "cooperatives." (Texas Br. 18-19.) But even vertically integrated utilities build transmission lines outside of their service territories, in places where they lack retail responsibilities. Br. of PUCT, *Entergy Texas Inc. v. Pub. Util. Comm. of Texas*, No. 03-18-006666-CV (Tex. App. – Austin, Mar. 28, 2019) at 30 ("Tex. 2019 Br."). Regardless, Texas's point only underscores that SB 1938 privileges the incumbent based on its existing in-state presence, regardless of whether it has retail responsibilities.

Contrary to the suggestion by Texas and *amici*, transmission is not a market characterized by "natural monopolies." Rather, Texas itself argued last year that vertically integrated utilities regularly use other companies' transmission lines to fully serve their customers, and their lines regularly cross each other's service areas. Thus, Texas

stated: "There are no geographic monopolies for transmission." Tex. 2019 Br. 30. In the interstate transmission grids at issue here, costs and benefits of major new transmission projects are shared across participants in a regional grid, which is why projects affected by SB 1938 will be funded not just by Texans, but also by customers in multiple neighboring states. ROA.43 (¶ 51). And even if transmission *was* a market characterized by monopolies, that alone would not suffice to render it immune from Commerce Clause scrutiny. *See* Opening Br. 37-39.

> ### 2. SB 1938's facial discrimination cannot be excused as a business form or incumbency preference.

Because SB 1938 discriminates based on the utility's existing in-state presence, it cannot be defended as a mere "business form" regulation. *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 42 (1980) (striking down business-form regulation that "discriminates among affected business entities according to the extent of their contacts with the local economy"). A preference that discriminates among companies based on their "contacts with" or "existing facilities" within a state is not an "evenhanded" business-form regulation, but a forbidden

discrimination against businesses in other states. *Lewis*, 447 U.S. at 42 ("[D]iscrimination against affected business organizations is *not* evenhanded because only banks, bank holding companies, and trust companies with principal operations *outside* Florida are prohibited.").

Texas wrongly argues that SB 1938 contains an "incumbency requirement," which is "not the same as a residence requirement." Texas Br. 25. But state laws protecting local incumbents against out-of-state competition are at the very heart of what the dormant Commerce Clause forbids. *E.g.*, *Dean Milk*, 340 U.S. at 356. Indeed, in this context, incumbency is just another way of expressing a preference for residents. Thus, SB 1938 allows utilities to build transmission if, but only if, they are already Texas "residents" because they have an "existing facility" in the state. States may not discriminate in favor of incumbents *with an in state presence* simply by calling it a preference for incumbents. *Tenn. Wine*, 139 S. Ct. at 2462; *Granholm*, 544 U.S. at 475. Texas cannot restrict homebuilding to those homebuilders currently constructing houses in Texas, and cannot limit oil exploration only to those incumbents with wells in the ground; so, too, it cannot limit transmission services to the Texas incumbents.

Texas relies on *Colon Health*, in which the Fourth Circuit upheld a program requiring new entrants in a market to obtain a certificate of need—thereby slowing down competition for incumbents. *Colon Health Centers of Am., LLC v. Hazel*, 813 F.3d 145, 149 (4th Cir. 2016). Texas, too, has a certificate-of-necessity program for transmission services—but under SB 1938, those certificates now can only be awarded to incumbents with existing facilities in Texas. Nothing in *Colon Health* suggests that the court would uphold a scheme that allowed *only* the in-state incumbents to receive a certificate.

### 3.    SB 1938's facial discrimination cannot be defended in light of *Tennessee Wine*, *Carbone*, and other Supreme Court Commerce Clause precedents.

Texas observes that SB 1938 disfavors some in-state companies too—but laws that favor only a few in-state businesses, or just a single favored monopoly, violate the Commerce Clause even if they also discriminate against some in-state entities. *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 391 (1994); *Dean Milk*, 340 U.S. at 354 n.4.

Texas argues *Carbone* involved "a burden on the flow of goods" rather than "the building of transmission lines." (Texas Br. 28.) But

*Carbone* recognized that "the article of commerce is not so much the solid waste itself, but rather the service of processing and disposing of it." *Carbone*, 511 U.S. at 391. In *Tennessee Wine*, the Supreme Court also rejected a proposed distinction between products and services, explaining that the Commerce Clause analysis of cases like *Granholm* was not "limited to discrimination against products or producers," but "[o]n the contrary … the Clause prohibits state discrimination against all 'out-of-state economic *interests*.'" *Tenn. Wine*, 139 S. Ct. at 2471 (quoting *Granholm*, 544 U.S. at 472). *Tennessee Wine*, the Supreme Court's most recent Commerce Clause pronouncement, underscores the discrimination here: even in the area of alcoholic beverages, where States have explicit authority to regulate under the 21st Amendment, States cannot advantage in-state residents. 139 S. Ct. at 2471. If States cannot use their broad 21st Amendment powers to enact laws that favor in-state residents, then *a fortiori* States cannot use their general police powers to outright ban outsiders from competing to provide instrumentalities of commerce. The police power is not a license to discriminate. *Barrett v. City of N.Y.*, 232 U.S. 14, 31 (1914).

9

Texas suggests *Carbone* and other "flow-control" cases did not involve the regulatory burdens of power companies. Not so. *E.g.*, Tex. Health & Safety Code § 361.001 *et seq*. (regulating solid waste disposal). In fact, *Carbone* also involved a "regulatory compact": Clarkstown was able to build a required waste-processing plant without paying for it, and in exchange, the contractor received the exclusive right to process all local waste at the facility for five years. *Carbone*, 511 U.S. at 387. This scheme was struck down; states may not enter into "compacts" with favored private entities to discriminate against their competitors.

Seeking to avoid the controlling impact of *Carbone*, Texas and its *amici* point to *United Haulers*, where the government itself entered the market as a participant as a state-created public benefit corporation. There the Court "simply recognize[d] that a law favoring a ***public*** entity and ***treating all private entities the same*** does not discriminate against interstate commerce as does a law favoring local business over all others." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 345 n.6 (2007) (emphasis added). This decision by its own terms does not support SB 1938, which discriminates in favor of a few local, ***private*** businesses at the expense

of non-local ***private*** businesses. *Id.* at 334 ("The only salient difference [with *Carbone*] is that the laws at issue here require haulers to bring waste to facilities owned and operated by a state-created public benefit corporation. We find this difference constitutionally significant."). Indeed, the Supreme Court has been clear on this point, explaining: "If instead the government had created a monopoly in favor of a private hauler, we would have struck down the law just as we did in *C&A Carbone.*" *Dep't of Revenue v. Davis,* 553 U.S. 328, 347 (2008) (citations omitted).[2]

These well-established precedents flatly reject *amici* SPS and Entergy's suggestion that Texas has free reign to eliminate competition and give private, local businesses a monopoly, let alone with respect to a market for providing transmission services to interstate system operators like MISO.

---

[2] Some privately owned utilities are referred to as "public utilities," but *United Haulers* applies only when governments "provide public goods and services on their own, unlike private businesses." *Davis*, 553 U.S. at 340.

### 4.  SB 1938's discrimination is especially indefensible in light of its impact on interstate transmission projects.

None of Texas's cases or arguments come to grips with the fact that this is an interstate transmission project. We are aware of no case (except the Eighth Circuit's decision in *LSP Transmission Holdings, LLC v. Sieben*, 954 F.3d 1018 (8th Cir. 2020)),[3] and none has been cited, that allows a state to create a monopoly for in-state incumbents when regulating interstate projects. Here, the projects at issue are commissioned by an interstate system operator pursuant to Federal law and FERC regulations, will be operated under the direction of the interstate system operator, and residents in other states will pay part of the rates.

---

[3] Even the rationale in *Sieben* would not apply to SB 1938, which goes beyond laws granting right of first refusals, and categorically prohibits non-Texas entities from building transmission lines, even when the incumbent elects not to build the line; it can assign its rights, but only to another company certificated in that area of Texas. SB 1938 § 4(g).

**B.     UNLIKE THE RETAIL LAW IN *TRACY*, SB 1938 DISTINGUISHES AMONG SIMILARLY-SITUATED ENTITIES PROVIDING EXACTLY THE SAME SERVICE IN WHOLESALE MARKETS.**

### 1.     *Tracy* does not endorse a "Public Utilities" exception to the Commerce Clause.

Texas proposes an overbroad reading of *General Motors Corp. v. Tracy*, 519 U.S. 278 (1997), relying primarily on a dissenting opinion for the idea that *Tracy* creates a free-standing "public utilities exception." This position is in the dissent for a reason: the Supreme Court has repeatedly subjected utility regulations to Commerce Clause scrutiny. *Wyoming v. Oklahoma*, 502 U.S. 437 (1992); *New England Power Co. v. New Hampshire*, 455 U.S. 331 (1982). *Tracy* expressly reaffirmed that "utilities should not be insulated from our contemporary dormant Commerce Clause jurisprudence by formalistic judge-made rules . . . [S]tate regulation of retail sales is not, as a constitutional matter, immune from our ordinary Commerce Clause jurisprudence[.]]" 519 U.S. at 291 n.8

Under Texas's view, *Tracy* would allow states to prop up utilities' retail sales not just by limiting competition in the *retail* market, but also by eliminating competition in whatever other markets the favored utilities might choose to enter. Justice Stevens warned that such a rule

would allow states to give electric utilities a monopoly over selling light bulbs or thermostats, as long as the extra revenue might incidentally help their retail operations. *Tracy*, 519 U.S. at 314 (Stevens, J., dissenting). Texas goes even farther, suggesting that *Tracy* should be interpreted to allow states to grant monopolies even in an interstate wholesale bidding process organized by interstate system operators.

Properly understood, *Tracy* simply allows states to privilege public utilities' *retail sales* of gas (or electricity), even at the expense of other *retail* competitors in the same market. It does not allow states to privilege those utilities' sales of any other product in whatever non-retail markets they might choose to enter. Texas cannot exclude out-of-state firms from competing to operate gas pipelines, coal transport, or uranium supply—all essential inputs into the ultimate delivery of power at retail. So too with interstate transmission lines.

> **2.**   ***Tracy*'s approval of preferential tax treatment for regulated retail sales does not insulate an outright prohibition on out-of-state competitors for non-retail transmission business.**

*Tracy* did not involve a geographic preference for utilities with in-state facilities, but rather a tax exemption for retail sales by fully regulated "local distribution companies." *Id.* at 282 – 83. Under *Tracy*,

the state may use its unquestioned power over retail power distribution to protect fully regulated retail products against competition from unregulated retail products. That is not this case. *Tracy* did not reach the "hypothetical" possibility of a law that discriminates against distribution companies located in other states, since "the Ohio courts might well extend the challenged exemption to out-of-state utilities if confronted with the question." 519 U.S. at 310-11. Here there is no doubt: SB 1938 favors utilities if, but only if, they have an existing facility in Texas.

### 3. Transmission-only companies and vertically integrated utilities are similarly situated in the only market where they compete.

Unlike the law at issue in *Tracy*, SB 1938 discriminates between similarly situated entities. Texas argues that vertically integrated utilities are differently situated because their *retail* sales are subject to unique regulations. But transmission-only companies do *not* compete with vertically integrated utilities in the retail markets subject to those unique regulations. In the market in which they *do* compete against each other—the market to provide interstate transmission services for operators like MISO—no such unique regulations apply, so all utilities

are identically situated. In other words, with or without SB 1938, any utility building or operating a transmission line must comply with the same regulatory requirements from the PUCT. That suffices to distinguish *Tracy*, where the entities were not similarly regulated *even in the noncaptive retail market where they competed* against one another.

Contrary to Texas's argument, if NextEra built a transmission line in Texas (regardless of SB 1938), it would "by definition" be characterized as "an electric utility" under Texas law. *PUCT v. Cities of Harlingen*, 311 S.W.3d 610, 617 (Tex. App. – Austin, 2010, no pet.); PUBLIC UTILITY REGULATORY ACT, TEX. UTIL. CODE § 31.002(6). As such, NextEra would be subject to the regulations Texas and its *amici* rely on—which apply to any "electric utility." Thus, it would have the same obligations as any other electric utility to "furnish service, instrumentalities, and facilities that are safe, adequate, efficient, and reasonable." TEX. UTIL. CODE § 38.001. SPS cites Texas Utilities Code Section 35.005, but that also applies to any "electric utility," so NextEra would be under the same obligation as any other utility to construct

16

facilities compliant with PUCT regulations. TEX. UTIL. CODE § 35.005(b).

Finally, although Texas and *amici* argue that vertically integrated utilities can charge a "bundled rate" if they supply both transmission and distribution, the truth is that "vertically-integrated utilities already use transmission belonging to other utilities," so "Texas customers already have FERC-set transmission rates factored into their retail rates." Texas 2019 Br. at 29. Accordingly, if NextEra provided transmission services in Texas, as the Texas Attorney General argued last year, "utilities' rate cases w[ould] be handled the same way as they are now." *Id.*

## C.   NEITHER FERC NOR CONGRESS HAS APPROVED OF LAWS LIKE SB 1938.

Despite the fact that the United States filed a brief supporting NextEra,[4] Texas and its *amici* wrongly suggest that the federal government has actually approved of laws like SB 1938.

---

[4] While Texas and SPS refer to the brief of the "Antitrust Division," the brief represents the views of the United States.

FERC Order No. 1000 did not preempt laws like SB 1938. But FERC's decision not to preempt does not insulate laws from the Commerce Clause. *Wyoming*, 502 U.S. at 458. FERC's Chairman made this point explicit, noting: "The Commission's order today does not determine the constitutionality of any particular state right-of-first-refusal law. That determination . . . lies with a different forum, whether state or federal court." Midwest Indep. Transmission Sys. Operator, Inc., 150 FERC ¶ 61037, 61195 (F.E.R.C. Jan. 22, 2015) (Bay, Comm'r, concurring).

Nor has Congress approved of laws like SB 1938. While the Federal Power Act reserves some regulatory powers to the state, it does not insulate those regulations from Commerce Clause scrutiny. *Wyoming*, 502 U.S. at 458 ("Our decisions have uniformly subjected Commerce Clause cases implicating the Federal Power Act to scrutiny on the merits."); *New England Power*, 455 U.S. at 341. SPS cites 16 U.S.C. § 824p, which provides that in certain circumstances, FERC can override a State's permitting authority over transmission lines. But by expressly revoking States' authority in specific instances, Congress did not allow States to violate the Commerce Clause in all other areas

18

where they retain permitting authority. *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 91 (1984). The authority to permit is not a license to discriminate.

### D. SB 1938 HAS THE EFFECT OF DISCRIMINATING AGAINST OUT-OF-STATE UTILITIES.

SB 1938 has the unconstitutional effect of excluding out-of-state businesses from building interstate transmission lines in Texas. By definition, all of the favored entities under SB 1938 have an existing in-state presence, but nonetheless Texas argues that many of those entities are "appropriately classified as 'out-of-state' entities" because they have shareholders, parent companies, or other operations in other states. (Texas Br. 37.) No decision from this Court or the Supreme Court has ever adopted such a rule, and other circuits have rejected it. *Fla. Transp. Servs., Inc. v. Miami-Dade Cnty.*, 703 F.3d 1230, 1259 (11th Cir. 2012); *Walgreen Co. v. Rullan*, 405 F.3d 50, 58 (1st Cir. 2005).[5] Under such a rule, *Carbone* would be reversed if the Clarkstown

---

[5] The Eighth Circuit considered such a rule in *Sieben*, but ultimately declined to address "whether an entity that has an in-state presence but is headquartered elsewhere is considered an in-state entity for the

waste-processor was owned by a Pennsylvanian, *Dean Milk* overturned if some of Madison's milk processors had parent companies in Chicago; and *Granholm* was wrongly decided, since some New York wineries are owned by out-of-state entities. Significantly, none of these cases even *considered* whether the favored entities had out-of-state owners— because it is irrelevant where a law discriminates in favor of entities with an existing in-state presence.

Alternatively, Texas wrongly argues that out-of-state entities could simply purchase one of the incumbent, in-state utilities favored by SB 1938. No case supports that theory, which would nullify the dormant Commerce Clause in almost every conceivable case. States "cannot require an out-of-state firm 'to become a resident in order to compete on equal terms.'" *Granholm*, 544 U.S. at 475 (citation omitted). They certainly may not require an out-of-state firm to *buy a resident* utility just to enter the market.

---

purpose of dormant Commerce Clause review." *Sieben*, 954 F.3d at 1029 n.7.

Because the effect of SB 1938 is to exclude all companies who are not already Texas incumbents from the market relating to interstate transmission facilities, a discriminatory effect is easily seen.

### E.  SB 1938 WAS ENACTED WITH A DISCRIMINATORY PURPOSE.

Discriminatory purpose is a fact question. *Wal-Mart Stores Inc. v. Tex. Alcoholic Bev. Comm'n*, 945 F.3d 206, 218 (5th Cir. 2019). At this stage, NextEra needs only "prima facie case," *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 289 (5th Cir. 2004), which it has pleaded.

*First*, the effect of SB 1938 will be to preclude out-of-staters, and the legislature was "aware of the likely disproportionate effect of the law on" out-of-staters. *Veasey v. Abbott*, 830 F.3d 216, 236 (5th Cir 2016). ROA.46-47 (¶ 63). Texas claims SB 1938's purpose is to bar transmission-only companies, but cannot deny that the effect of SB 1938 is to exclude all out-of-state entities. Nor is Texas' focus on transmission-only companies credible—SB 1938 benefits transmission-only companies if they already have facilities in Texas.

*Second*, Texas suddenly excluded out-of-staters when competition came to the State.[6] Texas law long allowed out-of-State entrants, and only changed its law when NextEra was awarded the Hartburg-Sabine project. ROA.45-46 (¶ 61). That sudden response to the entry of a disfavored group indicates discriminatory motive. *Lewis*, 447 U.S. at 32; *Veasey*, 830 F.3d at 241.

*Third*, the sequence of events leading to SB 1938 evidences discrimination. The law was rushed to passage. ROA.47 (¶ 65). Texas belittles this evidence, but a "hurried pace . . . strongly suggests an attempt to avoid in-depth scrutiny." *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 228 (4th Cir. 2016). That is what NextEra pleads: Texas chose a law whose means bear virtually no relationship to its purported neutral ends, which suggests discriminatory purpose. *Cooper v. McBeath*, 11 F.3d 547, 554 (5th Cir. 1994); *S. Dakota Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 595 (8th Cir. 2003). ROA.50-51 (¶¶ 75-77).

---

[6] These allegations distinguish *Sieben*, which upheld a Minnesota law from a purpose challenge, in part, because the law continued Minnesota's prior regulatory approach. *Sieben*, 954 F.3d at 1018.

On this score, Texas says little. The legislature cited two reasons for SB 1938: protecting reliability and protecting PUCT's jurisdiction. ROA.50-51 (¶¶ 76-77). Texas does not defend the reliability pretext, as out-of-state firms have proven perfectly capable of reliably delivering transmission. ROA.50-51 (¶ 77). Nor were there legitimate concerns about PUCT's jurisdiction: just weeks before SB 1938's passage, the PUCT itself (through the Attorney General) explained that allowing transmission-only companies outside of ERCOT would not cause "relinquishment of jurisdiction." ROA.50 (¶ 76).

Texas cites the Bill Analysis, which did not expressly announce discriminatory aims. But "discriminatory intent need not be proved by direct evidence." *Rogers v. Lodge*, 458 U.S. 613, 618 (1982).

*Fourth*, the House Bill sponsor,[7] declared that SB 1938 was passed because "transmission operations are best managed by

---

[7] Entergy discounts this statement because it came from the House sponsor whereas Texas passed the Senate Bill. But the bills were substantially identical (ROA.46 (¶ 62)) and approval from both houses was needed to pass SB 1938.

accountable companies with boots on the ground in our communities."[8] ROA.47 (¶ 64). Texas attempts to salvage the statement by claiming that, even though it facially singles out companies who are not in Texas, it is really about responding to outages. (Tex. Br. 33.) But the statement does not address outages, and a belief that only firms with a preexisting in-state presence can respond to outages is no less discriminatory than a naked preference for in-state firms.

Finally, Texas cites a presumption of legislative good faith, but "presumptions are evidentiary standards that are inappropriate for evaluation at the pleadings stage." Charles Alan Wright & Arthur Miller, 5B Fed. Prac. & Proc. § 1357 (3d ed.). Regardless, the presumption cannot defeat well-pleaded allegations of discrimination because it does not apply in the face of evidence of discrimination. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66

---

[8] In a footnote, Texas dismisses this statement as a "stray" remark. It is, however, the sponsor of the Bill speaking formally to a legislative committee. This Court has relied on evidence from legislative sponsors to prove discriminatory intent. *Veasey*, 830 F.3d at 236 (relying on statement from "one of the authors of SB 14" to justify remand for consideration of evidence).

(1977). Indeed, this Court has repeatedly remanded for a determination of purpose (rather than rendering based on the presumption) when faced with evidence of discrimination. *Wal-Mart*, 945 F.3d at 218.

## F.     SB 1938 DID NOT CODIFY EXISTING LAW.

Before SB 1938, the state courts, the PUCT, and the Attorney General agreed that out-of-state companies could enter Texas and provide transmission services. *Harlingen*, 311 S.W.3d at 614; *Joint Petition of Sw. Pub. Serv. Co. & Sw. Power Pool, Inc. for Declaratory Order*, 2017 WL 5068379, at *1 (Oct. 26, 2017). As the Attorney General summarized last year:

> Texas law does not explicitly or implicitly grant vertically-integrated utilities a right of first refusal or the exclusive right to construct transmission lines in their certificated areas. [The Texas utilities] ask the Court to invent a state-law right to exclude wholesale transmission competitors from bidding on transmission projects within a vertically-integrated electric utility's certificated retail service area. [The utilities] ignore the plain language of the applicable statutes, the Legislature's stated preference for competitive markets, and the reasonable and long-standing practice in Texas allowing transmission lines to cross another utility's service area.

Tex. 2019 Br. 30. In arguing that SB 1938 enshrined what purportedly was always the law, Texas' *amici* not only ignore that SB 1938 had to insert new text and delete old text, they also rehash arguments they already lost at the PUCT. For example, although SPS argues that Texas has always recognized a transmission monopoly right, it made and lost that same argument before the PUCT. *Joint Petition*, 2017 WL 5068379, at *1 ("[T]he Commission concludes that SPS does not possess an exclusive right to construct and operate transmission facilities").

Texas and its *amici* also argue that SB 1938 preserved Texas' historical practices. But before SB 1938, Texas *allowed* out-of-State transmission providers: both in the CREZ projects and by allowing CCNs to be issued to them outside the CREZ program. ROA.34-36 (¶¶ 21-22, 24). Moreover, substantial out-of-state transmission was not opened to Texas until FERC's Order No. 1000 eliminated federal rights of first refusal, and there too, Texas initially accepted out-of-state bidding. ROA.45 (¶ 59).

Regardless, even a longstanding historical practice that offends the Commerce Clause must give way to the Constitution.

## II.   SB 1938 FAILS UNDER *PIKE*.

Laws that do not directly discriminate are unconstitutional if they impose burdens on interstate commerce that are "clearly excessive in relation to their putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). This inquiry is fact-intensive, and therefore, inappropriate for resolution on the pleadings. *United Transp. Union v. Foster*, 205 F.3d 851, 863 (5th Cir. 2000).

SB 1938 imposes substantial burdens on commerce: it imposes direct costs on transmission users across the SPP and MISO regions, ROA.43 (¶ 52); ROA.53 (¶ 84), disincentivizes the identification of new transmission lines, which harms the transmission grid, U.S. Amicus 27, and by harming overall grid health, makes it harder for out-of-state generation to reach Texas. *Id.*

Texas says nothing about these burdens, arguing instead that SB 1938 must survive because it is not inconsistent with federal goals. Even assuming that were true, that has never been the sole inquiry under *Pike* (it was not the inquiry in *Pike* itself). Moreover, SB 1938 harms federal aims: the United States explains that SB 1938 will cause

"less robust transmission," which leads to "reduced access to lower cost and more reliable generation." U.S. Amicus 27.

Texas argues that SB 1938 survives *Pike* because it is a health and safety regulation. But the Court cannot "rely merely on the assertion of an accepted local interest." *Serv. Mach. & Shipbuilding Corp. v. Edwards*, 617 F.2d 70, 75 (5th Cir. 1980). Instead, it must "examine the benefits that supposedly result from the local law." *Id.* At this stage, evidence of those benefits are lacking. Based on Texas' own history, out-of-State firms are just as capable as in-state firms, and therefore, SB 1938 provides no benefits. ROA.50-51 (¶ 77).[9]

---

[9] *Sieben* determined that Minnesota's law would not eliminate competition "completely" because "[i]ncumbents are not obligated to exercise their ROFRs." 954 F.3d at 1031. In that way, the Minnesota law is unlike SB 1938, under which out-of-state firms are barred even if the incumbent chooses not to exercise its right to build, because the law forbids transfer to any entity that currently lacks physical presence in Texas. Whatever sliver of competition Minnesota's law left open, Texas' law swallows.

## III.   SB 1938 VIOLATES THE CONTRACTS CLAUSE.

### A.   SB 1938 SUBSTANTIALLY IMPAIRED NEXTERA'S CONTRACTS.

Texas argues there was no substantial impairment of NextEra's Selected Developer Agreement ("SDA") with MISO or its contract to purchase the Jacksonville-Overton line because the agreements do not grant NextEra vested rights. Texas Br. 43. However, substantial impairment is not a question of vested rights; it is a question of whether a contract exists. *General Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992) (first inquiry is "whether there is a contractual relationship"). The only case Texas cites, *Dodge v. Board of Education of Chicago*, 302 U.S. 74, 79-80 (1937), involved whether a pension statute constituted a "contract."   Here, there is no doubt that NextEra has a contract. ROA.440 ("The Selected Developer shall, at its expense, design, procure, construct, and own, and install the Project . . . ."); ROA.54 (¶ 87).

SB 1938 more than impairs the contracts; it destroys them, precluding NextEra from owning or operating the lines. That is unquestionably substantial impairment. *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 27 (1977). Texas' argument that the SDA did not give NextEra the "right" to build because it required PUCT approval

misses the mark. The SDA includes requirements for regulatory permits. But when the State after-the-fact enacted a law that makes it impossible to obtain those permits, substantial impairment occurred. *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411 (1983).

Texas concedes that an "important consideration in [the] substantial impairment analysis is the extent to which the law upsets the reasonable expectations the parties had at the time of contracting[.]" *United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 627 (5th Cir. 2010). NextEra reasonably expected that it would be able to apply for PUCT approval, a view shared by MISO, the PUCT, and the Attorney General, and ultimately to build and operate the projects. *See* Part I.F, *supra*. Accordingly, NextEra, many other bidders, and MISO devoted resources to the bid process. *Six Kingdoms Enterprises, LLC v. City of El Paso*, 2011 WL 65864, at *6 (W.D. Tex. Jan. 10, 2011). Texas' assertion that the only "right" the SDA bestowed on NextEra was a recoupment of its construction costs plus a reasonable return on that investment ignores NextEra's expectations of profits from the operation of the transmission line.

30

Texas asserts that, "when a State is not a party to the contract, a legislative change in a heavily-regulated industry does not disrupt a party's reasonable expectations or extensively impair the contract." Texas Br. 46. That assertion is unsupported by the cases Texas cites. *United Healthcare*, 602 F.3d at 627 (addressing deference standard when government is a contracting party); *Alliance of Auto. Mfrs., Inc. v. Currey*, 984 F.Supp.2d 32, 54 (D. Conn. 2013) (when the change in law was foreseeable, there is likely not substantial impairment); *Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 439 (8th Cir. 2007) (regulation foreseeable because gambling exists "at the sufferance of the Legislature"); *Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359 (3d Cir. 2012) (law foreseeable because industry already regulated "in a particular manner"). Instead, even in regulated industries, courts must determine whether a new regulation was foreseeable. *Six Kingdoms*, 2011 WL 65864, at *6 ("While the retail pet market was regulated at the time Plaintiff entered into the Agreement … it was not so pervasively regulated or regulated specifically in such a way that either party could foresee the possibility of price regulation."). For that reason, Texas' reliance on *Energy Reserves* is unavailing.

There, the contract envisioned price controls, so the plaintiff had to foresee that "its contractual rights were subject to alteration by state price regulation." 459 U.S. at 416.

While a "reasonable modification of statutes" is "much less likely to upset expectations," *U.S. Trust*, 431 U.S. at 19 n.17, SB 1938 is a new law that eviscerated NextEra's contractual rights. In this circumstance, Courts routinely find substantial impairment, even in regulated industries. *United Healthcare*, 602 F.3d at 630 (substantial impairment in regulated health insurance field because "[u]nlike in *Energy Reserves Group*, nothing in the contracts indicates that the parties understood that there was a possibility that the landscape of plan options was subject to change"); *E & E Hauling, Inc. v. Forest Pres. Dist.*, 613 F.2d 675, 681 (7th Cir. 1980) (finding plaintiff stated Contracts Clause claim and remanding for hearing on law forbidding liquid or sewage sludge to enter a landfill).

## B.    DEFENSES FOR IMPAIRMENT ARE NOT PROPERLY RESOLVED ON A MOTION TO DISMISS.

If a contract is substantially impaired, the court addresses whether there is a "significant and legitimate public purpose" for the law and whether the impairment is "of a character appropriate to the

public purpose." *Energy Reserves*, 459 U.S. at 411-12 (internal quotations omitted). These are fact-driven issues, *Kuritz v. New York*, 2012 WL 6020039, at *22 (N.D.N.Y. Dec. 3, 2012); *Air Evac EMS, Inc. v. Cheatham*, 260 F. Supp. 3d 628, 647 (S.D. W. Va. 2017), so resolving them on a motion to dismiss was improper, especially because NextEra pleads that SB 1938 does not serve legitimate purposes. ROA.50-51 (¶¶ 75-77).

## IV. NEXTERA IS ENTITLED TO A PRELIMINARY INJUNCTION.

SB 1938 discriminates against interstate commerce, and therefore, is virtually per se invalid. *Or. Waste Sys., Inc. v. Dep't of Envt'l Quality*, 511 U.S. 93, 100 – 101 (1994). Texas suggests that the Court can affirm even under such circumstances, but to do so, this Court would have to determine—on review from a motion to dismiss— that the justifications for SB 1938 survive "the strictest scrutiny." *Id.* at 101 (citation omitted). Texas does not explain how, at this stage, the Court could possibly test its proffered justifications against the pleadings in the Complaint that those justifications are pretextual. ROA.50-51 (¶¶ 75-77.)

Without a prompt preliminary injunction, NextEra will suffer irreparable harm because it will likely lose the Hartburg-Sabine project, ROA.3009-10, and the Jacksonville-Overton line, ROA.193. Indeed, underscoring the need for expeditious action, NextEra has been notified that its contract to purchase the Jacksonville-Overton line will be cancelled. Texas does not dispute that NextEra will imminently lose its projects, but suggests that the injury is not irreparable because NextEra can recover prudently incurred costs. True enough for Hartburg-Sabine (although not for Jacksonville-Overton), but NextEra cannot recover its lost profits from either project. Because these benefits would never be recoverable on account of immunity, NextEra will suffer irreparable harm. *Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016).

To be clear, NextEra does not request an injunction requiring the PUCT to issue it a CCN. Instead, a narrowly tailored injunction would simply prevent the PUCT from denying a CCN *based on SB 1938*, while still considering all of its traditional factors. That type of injunction would protect Texas' interests and ensure that NextEra does not lose its valuable project through delay alone. Moreover, an injunction would benefit the public; neither Texas nor its *amici* deny that FERC

34

instituted Order No. 1000 to allow for companies like NextEra to compete for these interstate transmission projects, and those public benefits would be lost without an injunction. Because NextEra faces the imminent loss of its project, *see* Appellants' Mot. To Expedite, NextEra requests that this Court act as promptly as possible to reverse and remand.

## <u>CONCLUSION</u>

For the foregoing reasons, the District Court's order dismissing the Complaint and denying the preliminary injunction should be reversed.

Dated: April 29, 2020

Respectfully submitted,

By: */s/ Jeffrey Mark Tillotson*
Jeffrey Mark Tillotson

STUART H. SINGER
PASCUAL OLIU
EVAN EZRAY
Boies Schiller Flexner LLP
401 East Las Olas Boulevard
Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

JEFFREY M. TILLOTSON
Tillotson Law
1807 Ross Ave., Suite 325
Dallas, Texas 75201
Telephone: (214) 382-3040
Facsimile: (214) 292-6564
jtillotson@tillotsonlaw.com

ATTORNEYS FOR APPELLANTS

35

## CERTIFICATE OF SERVICE

I hereby certify that this Motion has been served by electronic service through the CM/ECF filing system and by email or first-class mail on all parties to this action, as follows:

George Hoyt
Entergy Services, LLC
919 Congress Ave., Suite 701
Austin, TX 78701

Max Minzner
Jenner & Block LLP
1099 New York Ave. NW
Suite 900
Washington, DC 20001

Jason Perkins
Jenner & Block LLP
1099 New York Ave. NW
Suite 900
Washington, DC 20001

Miguel Suazo
Senior Counsel, Entergy Services,
  LLC
919 Congress Ave.
Suite 701
Austin, TX 78701

Mark A. Walker
Xcel Energy Services Inc.
816 Congress Avenue
Suite 1650
Austin, TX 78701

Tassity Johnson
Jenner & Block LLP
1099 New York Ave NW
Suite 900
Washington, DC 20001

Matthew E. Price
Jenner & Block LLP
1099 New York Ave. NW
Suite 900
Washington, DC 20001

Wajiha Rizvi
Entergy Services, LLC
919 Congress Ave.
Suite 701
Austin, TX 78701

By: */s/ Jeffrey Mark Tillotson*
        Jeffrey Mark Tillotson

## CERTIFICATE OF COMPLIANCE

1.    This Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because this Brief contains <u>6,482</u> words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f).

2.    This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this Brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 with Century Schoolbook 14-point type.

*/s/ Jeffrey Mark Tillotson*
Jeffrey Mark Tillotson

## CERTIFICATE REGARDING ELECTRONIC SUBMISSION

I hereby certify that: (1) required privacy redactions have been made; (2) the electronic submission of this document is an exact copy of the corresponding paper document; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.


*/s/ Jeffrey Mark Tillotson*
Jeffrey Mark Tillotson